**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**
CASE NO. 9:16-cv-80502-Bloom/Valle

| | |
|---|---|
| JUSTIN BOUTON, individually and,<br>on behalf of others similarly situated,<br><br>    Plaintiff,<br><br>v.<br><br>OCEAN PROPERTIES, LTD.,<br>a foreign corporation,<br>OPROCK JUPITER FEE, LLC,<br>a foreign limited liability company,<br>OPROCK JUPITER TRS, LLC,<br>a foreign limited liability company, and<br>GHM JUPITER, LLC,<br>a foreign limited liability company.<br><br>    Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>/ |

       **CLASS ACTION**

       **JURY TRIAL DEMANDED**

## OCEAN PROPERTIES, LTD.'S MOTION FOR SUMMARY JUDGMENT

Defendant Ocean Properties, Ltd. ("OPL"), pursuant to Federal Rule of Civil Procedure 56 and Southern District of Florida Local Rule 56.1, respectfully requests this Court grant summary judgment in its favor and against Plaintiff Justin Bouton ("Bouton") with respect to *Plaintiff's Second Amended Class Action Complaint for Violations of the Fair and Accurate Credit Transactions Act (FACTA)* [DE 47] (the "Second Amended Complaint").  OPL joins all issues raised in *GHM Jupiter, LLC's Motion for Summary Judgment* [DE 325], filed on September 22, 2017, and to the extent not explicitly stated therein, incorporates all arguments that this Court lacks subject matter jurisdiction as raised in the *Opposition to Plaintiff's Motion for Class Certification* [DE 281].

## INTRODUCTION

Plaintiff has not discovered a scintilla of evidence through his harassing, duplicative, and

burdensome discovery (including four out-of-state depositions) that would support holding the legally distinct and separate corporate entity, Ocean Properties, Ltd., liable for the alleged FACTA violations at the Jupiter Beach Resort.[1]   Every allegation Plaintiff argued in his opposition to the motion to dismiss has been conclusively disproved.[2]   Plaintiff admits that he has not alleged a veil-piercing theory in the Second Amended Complaint and has referred to this absolute requirement as a "strawman veil piercing argument."[3]   Response to Motion to Dismiss [DE 80], at 2-4.   However, a veil piercing theory for liability is "black letter law" in this jurisdiction (requiring dismissal).

Among others, the Court allowed Plaintiff to proceed on "direct liability" theory, a joint ownership and management theory, and an agency theory.   It is clear that none of these theories are supported by a shred of evidence. This record indisputably shows that OPL owns no interest in the Jupiter Beach Resort, does not in any way manage or control the Jupiter Beach Resort, has no employees at the Jupiter Beach Resort and never controlled the printing or delivery of folios

---

[1] See [DE 247] for an exhaustive table of Plaintiff's discovery from June 30, 2016 to June 8, 2017.  And after June 8, 2017, Plaintiff conducted three additional out-of-state depositions, including the deposition of OPL's President.

[2] Among other allegations, Plaintiff argued that OPL had a centralized receipt-generation function that was the "sole activity at issue in this case," [DE 80] at 4, and that "OPL exercised centralized control over the receipt-generating process at the Jupiter Beach Resort."  [DE 80] at 6.   Upon confirming that Plaintiff's allegations were not supported by any evidence whatsoever, and that OPL had absolutely no involvement in the Jupiter Beach Resort or its use of Oracle's Opera software, Plaintiff should have immediately dismissed OPL because Plaintiff has been on notice at every stage of this litigation that OPL was an improper party.

[3] In admitting that he did not plead a veil-piercing argument, Plaintiff refers to the black letter law requiring a veil piercing theory as a "strawman veil piercing argument."  [DE 80] at 3 n.2.  Plaintiff also expressly admits that "Plaintiff did not allege a veil piercing theory."  [DE 80] at 9.  Plaintiff stated the he "is seeking to hold OPL liable for its own misconduct."  [DE 80] at 10.  OPL has no involvement in the Jupiter Beach Resort or the other 11 hotels, yet Plaintiff still pursues this frivolous suit. This Court has also made it clear in Order on Motion to Dismiss that it was not going to disregard corporate entities in this case. [DE 116] at 13.

to guests at the Jupiter Beach Resort.[4] No other theory can support holding OPL liable when OPL does not own, manage, operate, or control any of the 11 hotels, OPL does not have any contracts with co-defendants (like an exclusive management agreement), OPL has no contracts between itself and Oracle, OPL does not have any employees at the Jupiter Beach Resort, OPL never delivered a purportedly defective folio, and OPL never installed, maintained or supported Oracle's Defective Opera Upgrade.

Plaintiff feigned ignorance as to who should be sued, yet Plaintiff's counsel knew through production of emails from Chris Legg (a serial class plaintiff) that Plaintiff's counsel and Mr. Legg were investigating in public records (Sunbiz) regarding who to sue and discussing the size of the potential class four months before filing the instant lawsuit.  Legg Deposition Exhibits [DE 270-2].  Further, Plaintiff's fee agreement [DE 173] with his counsel reveals that Plaintiff knew the proper defendants *before filing the initial complaint* but sued only OPL for five months and joined the owner (Fee), lessee (TRS), and manager (GHM) *after* the deadline to join parties had passed.

Plaintiff's motivation for dragging OPL—an unquestionably improper party—is clear. Plaintiff is holding OPL in this litigation as long as possible to extort a settlement across multiple hotels (which now can be part of no class) despite uncontradicted, certified public records (which OPL presented to this Court at the motion-to-dismiss stage) showing OPL does not own, operate, or manage the Jupiter Beach Resort.  The evidence in this record shows that Plaintiff and his counsel were well aware of who the true Owners, manager and operator of the Jupiter Beach Resort were, as early as January 2, 2016.

---

[4] Also, OPL is not even an affiliate of the entities that own the Jupiter Beach Resort. In its Order reversing magistrate Valle's discovery order, this Court observed that Walsh family interests, not OPL had only approximately a 7% interest in the entity ultimately owning the Jupiter Beach Resort.  [DE 235] at 10.

Plaintiff's desire to extort OPL or improperly use OPL purely as conduit to 11 other hotels[5] is conclusively demonstrated by the lack of discovery taken related to Plaintiff's claim—Plaintiff never even requested to depose a Jupiter Beach employee, the Jupiter Beach Manager, or to depose a representative from co-defendants, Fee and TRS.   More astonishing is that, even though OPL's President, Mike Walsh, provided the service agents for the other 11 hotels, where Plaintiff thought there might have been FACTA violations (although the only competent record evidence here is there were no such violations),[6] Plaintiff refused to serve the proper legally distinct entities.   Plaintiff's discovery has proven beyond any possibility of dispute that OPL is an improper party, and this Court must enter judgment and relieve OPL from this expensive and wholly improper litigation.

## STATEMENT OF MATERIAL FACTS

1. **OPL.**  The Walsh Family and Walsh Family interests own more than 100 hotel-owning companies, including OPL.  Declaration of Rich Ade, [DE 193] at ¶14.  OPL only has six employees.  [DE 193] at ¶26.  The Walsh family, not OPL, has for the past 25 years formed numerous corporations and LLC's to own and hold property for the purpose of banking lending requirements, including formation of single purpose and special purpose entities for bankruptcy remoteness and limiting liability.  [DE 193] at ¶¶ 56, 58.  As the multi-tiered SPE structure became a common requirement in acquisition financing or re-financing, OPL divested itself of the multiple hotels, and the Walsh family formed and owns Portsmouth Corporate Financial Services which began operations in 1995.  [DE

---

[5] The use of OPL, as a conduit to 11 separate and distinct hotel owning entities who are not parties to this case, has failed and is not legally cognizable because Plaintiff has been unable to establish any FACTA violation at these other hotels. Moreover, the only evidence in the record is that after checking all these hotels, that were possible to check, none others actually had FACTA violations.

[6] [DE 208] at p.8 ¶H.

193] at ¶¶56-57.

2. Over the last several years, OPL, through its President Mike Walsh and its six (6) employees, assists in local marketing of the Delray Beach Marriott and provides clerical support services for the Delray Beach Marriott.  [DE 193] at ¶¶ 27, 29.  These six (6) OPL employees have no duties or employment obligation to, and do not nor perform any work or services at, any other hotel or property including the Jupiter Beach Resort.  [DE 193] at ¶30.  The employees are clerical in nature, like receptionists and assistants, and OPL does not have employees who could perform services to hotels directly.  [DE 164-9] at 222-23.  These employees have never had any involvement in the business or operation of the Jupiter Beach Resort or any other hotels.  [DE 193] at ¶30.

3. The only two hotels owned and operated by OPL during the relevant timeframe (the Delray Beach Marriott and the Holiday Inn Lakeside), [DE 290-13] at 133, lns. 6-9, had no FACTA violations because neither received a defective software upgrade from Oracle, [DE 290-13] at 140, lns. 21-23; [DE 290-13] at 142, lns. 13-15.

4. OPL does not have and has not had contracts to operate or manage any hotels other than the Delray Beach Marriott during the relevant time period (March 1, 2015, to present).  [DE 130-05] at ¶13.

5. OPL, its officers, and six (6) employees did not have any direct or indirect involvement in the FACTA violation alleged to have occurred at the Jupiter Beach Resort. [DE 193] at ¶35.  OPL's employees have never worked at the Jupiter Beach Resort and did not hand the Plaintiff the folio alleged to violate FACTA in this case.  [DE 193] at ¶35.

6. The Jupiter Beach Resort's contract with Oracle was signed by Cliff Lazenby, who, according to the contract, signed on behalf of TRS.  Jupiter's Oracle Contract [DE 99-

01].  Cliff Lazenby works as an employee of PCFSI only and has never been an OPL employee.  Declaration of Rich Ade [DE 130-5] at ¶7.  Mr. Lazenby is paid by PCFSI. Lazenby W-2, [DE 130-5] at p.8.  OPL was not a party (nor could it be) to the contract with Oracle for the instillation of the defective upgrade that purportedly caused the unmasking at the Jupiter Beach Resort.  [DE 99-01].

7. **Ownership and Operations of Jupiter.**  OPL does not directly or indirectly own the owner of the Jupiter Beach Resort & Spa (the "Resort"), OpRock Jupiter Fee, LLC ("Fee").  [DE 130-5] at ¶4; [DE 193] at ¶ 16; [DE 24-3] (Recital A in SNRA).  OPL does not directly or indirectly own the lessee of the Resort, OpRock Jupiter TRS, LLC ("TRS").  [DE 130-5] at ¶4; [DE 193] at ¶ 16; [DE 24-3] (Recital B in SNRA).  OPL does not directly or indirectly own the management company for the Resort, GHM Jupiter, LLC.  [DE 130-5] at ¶4 ("OPL has no ownership interest of any kind in these entities); [DE 193] at ¶ 16.  TRS entered into an exclusive management agreement for GHM Jupiter, LLC ("GHM") to manage the day-to-day operations of the Resort.  Rich Ade Deposition Transcript [DE 166-03], at p.70, lns. 6-10; GHM's Management Agreement [DE 76-1] at CM/ECF 12.

8. There are no contracts between Jupiter Beach's owner (OpRock Jupiter Fee, LLC), management company (GHM Jupiter, LLC), and OPL.   [DE 130-1; 130-3; 130-5; 193]. OPL's Answers to Interrogatories, [DE83-2].  OPL does not own and has no contract to operate or manage Jupiter Beach.  [DE 130-1; 130-3; 130-5; 193].  Thus, OPL does not have any direct, indirect or other ownership interest or control over Fee, TRS, or GHM. [DE 193] at ¶ 16.

9. OPL has no ownership, possession or control of the Resort, see Deeds to the Property

[DE 10-2], or involvement in the resort, see Subordination, Non-disturbance, and Recognition Agreement [DE 24-3]. The SNRA

10. The $295,000,000 mortgage on Jupiter ("Mortgage") and properties of other Oprock entities appearing in the public records of Palm Beach County do not refer to OPL and are not signed by any Walsh. [DE 66-4].

11. OPL does not carry the Resort or any loan to the Resort on OPL's financial statements. See [DE 83-7], Nos. 4-30.

12. Walsh siblings, **not OPL**, serve as directors, officers, and managers (within the meaning of corporate law) of the Walsh Hotel Entities and OPL is not an LLC manager or officer of the Jupiter Resort entities. [DE 193] at ¶9. Ocean Properties, Ltd. does not own the Jupiter Beach Resort and Spa. [DE 193] at ¶17. Walsh family interests, not any of the Walsh siblings who own OPL, are the ones that own less than 8% of the ultimate parent entity owning the Jupiter Beach Resort. [DE 193] at ¶10, 16. The Walsh siblings serve in management roles for the Walsh Family Interests and therefore indirectly own a total of just over 1% of the ultimate parent company. [DE 193] at ¶10. The remaining 92% is owned by the unrelated Rockwood interests. [DE 193] at ¶ 16.

13. OPL did not own or operate any of the hotels that may have received the defective Opera upgrade. [DE 130-05] at ¶12. None of OPL's subsidiaries ever owned a hotel that received the defective upgrade to version 5.04.02. [DE 130-05] at ¶12.

14. Neither OPL, nor any Walsh family member (whether or not working at OPL or PCFSI) participated in the decision to install the Defective Oracle Software, knew the software existed or had any knowledge it was to be installed at any hotel. [DE 193] at ¶73.

15. Additional public records demonstrate construction and repair done at the Jupiter Beach

Resort after 2007, was contracted on behalf of the proper legal entities.   Matrix of Building Permit Applications, [93-1].

16. **OPAL Collection, the Website, and Marketing.**  PCFSI markets Walsh Hotel Entities through the through the "Ocean Properties and Affiliates" and "OPAL" shared marketing websites referred to in Plaintiff's Second Amended Complaint.  [DE 193] at ¶ 8.

17. OPL did not create and has absolutely no involvement in the operation of the "OPAL Collection." [DE 193] at ¶18.  OPL does not have any input in the "Ocean Properties and Affiliates" or "OPAL" websites described in the Second Amended Complaint.  [DE 193] at ¶ 12.  The website domain is administered by PCFSI.  [DE 166-03] at 19, ln.2.

18. Neither OPL, nor its six (6) employees have or have ever had any involvement in the creation or maintenance of the Ocean Properties and Affiliates or OPAL websites referred to in Plaintiff's Second Amended Complaint, nor involvement in any brochure or other marketing materials referred to in Plaintiff's Second Amended Complaint.  [DE 193] at ¶32.  No one at OPL does anything with oceanprop.com, [DE 166-03] at 22, lns. 9-11, and OPL does not employ anyone with the ability to administer or maintain the content of the website. [DE 166-03] at 23, lns. 12-13.

19. The "OPAL Collection" is a marketing moniker for non-branded hotels and was created by the marketing department of PCFSI. [DE 193] at ¶18.  The OPAL Collection owns no hotels or other assets.   [DE 193] at ¶18.  The hotels being advertised as part of the OPAL collection are not owned, managed nor controlled by OPL.   [DE 193] at ¶18.  Further, OPL has no hotel that is part of the OPAL Collection.  [DE 193] at ¶18.

20. Registrations for Oceanprop.com, Opalcollection.com, and Oplhotels.com were made by PCFSI employees Matt Tobin, Dan Rich, and Loren Gray, who are not employed by

OPL.  [DE 193] at ¶33; [DE166-03] at 20, ln. 12, at 24, lns. 12-17.  OPL has never had access or control of these domains, and they have been maintained and paid for and used solely by PCFSI.  [DE 193] at ¶33.

21. OPL's six (6) employees also have no capacity to provide national advertising or marketing services to any hotel including the Delray Beach Marriott, or to create or maintain websites for any hotel, including the Delray Beach Marriott.  [DE 193] at ¶31.

22.  For trademark purposes, OPL trademarked "OPAL Collection," and assigned all rights to that name and phrase to PCFSI.  See Assignment [DE 193-3].  Only PCFSI, and not OPL, can use the phrase OPAL Collection in marketing the hotels PCFSI chooses to be part of the OPAL Collections.  [DE 193] at ¶34.

23. **PCFSI.**  PCFSI is a consulting and services provider that can provide accounting, financial, information technology, human resources, administrative, advertising and other services to hotel and property management companies and sometimes directly to hotel and property owners.  [DE 193] at ¶60.  GHM is one of PCFSI's clients. [DE 193] at ¶60. PCFSI provides its services to entities both associated with the Walsh family and to persons and entities not associated with the Walsh family.  [DE 193] at ¶60.  PCFSI does not own or operate hotels or real estate.  [DE 193] at ¶60.

24. OPL does not direct the operations of PCFSI.   [DE 193] at ¶62.  PCFSI is not a subsidiary of OPL.  Org Chart [DE 125-03]; Rich Ade Declaration [DE 193] at ¶25 (OPL owns its subsidiaries as disclosed in org chart); [DE 193] at ¶62 (Walshes are the shareholders of PCFSI).  Further, no officer, shareholder, or director of OPL while acting in their capacity for OPL, directs or controls the operations of PCFSI directly or indirectly.  [DE 193] at ¶62.  When Rich Ade or a Walsh family member participates in a

strategic decision for PCFSI, they do not act on behalf of OPL.  [DE 193] at ¶62.

25. **OPL's Lack of Involvement in Unmasking.**  The installation of the Defective Oracle Software at the Jupiter Beach Resort had nothing to do with OPL and was solely the result of actions by Oracle, with access to Jupiter's computers provided by PCFSI employees, who were supporting IT platforms at the Jupiter Beach Resort.  [DE 193] at 69.  PCFSI employee, Cliff Lazenby, at Oracle's urging, made the decision to allow the installation of the Defective Oracle Software at the Jupiter Beach Resort and the 11 Hotels.  [DE 193] at ¶70.

26. Neither OPL nor any of its shareholders or officers or directors (including Rich Ade in any capacity) participated in the decision to allow Oracle to install the Defective Software at the Jupiter Beach Resort had any knowledge that the Defective Oracle Software existed or was being installed anywhere.  [DE 193] at ¶73.

27. OPL has a number of subsidiaries.  They are all listed in the organization chart OPL produced.  [DE 125-3].  None own, operate, manage, or provide IT services to the Jupiter Beach Resort.  [DE 130-1; 130-3; 130-5; 164-3; 164-4].  Neither OPL nor its subsidiaries contract with Oracle to provide the Opera software at the Jupiter Beach Resort.  [DE 130-1; 130-3; 130-5; 164-3; 164-4].

28. **OPL's Involvement in Resolving the Problem.** OPL's only involvement in resolving the unmasking of expiration dates was to send PCFSI a copy of the original Complaint served by the Plaintiff in this case. It was then that Mr. Lazenby was tasked by PCFSI management to assist GHM in resolving the problem caused to their client OpRock Jupiter TRS by Oracle. [DE 130-5] at ¶8.  In resolving the problem, Mr. Lazenby was a PCFSI employee assisting only GHM.  [DE 130-5] at ¶8.  Like Mr. Lazenby, Dan Rich,

who assisted in resolving the problem, works as an employee of PCFSI only and has never been an OPL employee. [DE 130-5] at ¶7. Mr. Rich is paid by PCFSI. Rich W-2, [DE 130-5] at p.8.

## ARGUMENT

### I. OPL is Not and Has Never Been a Proper Party and Must Be Dismissed.

#### A. Plaintiff's Second Amended Complaint is Wholly Devoid of Veil Piercing Allegations.

Plaintiff admits that he has not alleged that OPL is liable through an alter ego, mere instrumentality, or other veil-piercing theory, [DE 80] at 2-4, which is a blackletter requirement for OPL to be liable for the acts of another legally distinct entity. The controlling statement in this jurisdiction regarding Florida's law on setting aside corporate limitations of liability provides:

> It is black letter law in Florida that to disregard this corporate fiction and hold the corporation's owners liable—to "pierce the corporate veil"—the plaintiff must prove that:
>
> > (1) the shareholder dominated and controlled the corporation to such an extent that the corporation's independent existence, was in fact non-existent and the shareholders were in fact alter egos of the corporation;
> >
> > (2) the corporate form must have been used fraudulently or for an improper purpose; and
> >
> > (3) the fraudulent or improper use of the corporate form caused injury to the claimant.

Molinos Valle Del Cibao, C. por A. v. Lama, 633 F.3d 1330, 1349 (11th Cir. 2011) (quoting Gasparini v. Pordomingo, 972 So.2d 1053, 1055 (Fla. 3d DCA 2008)); see also Nat'l Gear & Piston, Inc. v. Cummins Power Sys., LLC, 975 F. Supp. 2d 392, 404 (S.D.N.Y. 2013) (holding plaintiff's allegations do not clear the "high hurdle established by Delaware law" and stating "[i]t is well established law that allegations of mere shared management, shared corporate principles,

or a parent's ownership and operation of a subsidiary—even exclusively for the parent's gain—do not merit piercing the corporate veil" (collecting cases)); <u>Johnson v. Exclusive Properties Unlimited</u>, 720 A.2d 568, 571 (Maine 1998) (holding "before a court may pierce the corporate veil, a plaintiff must establish that: (1) <u>the defendant abused the privilege</u> of a separate corporate identity . . ." (emphasis added)).

By itself, the failure to allege an alter ego theory in this jurisdiction requires dismissal. <u>Garcia v. Kashi Co.</u>, 43 F. Supp. 3d 1359, 1395 (S.D. Fla. 2014) ("The Court concludes that the SAC must be dismissed as to Kellogg because it simply does not allege a 'mere instrumentality' or 'alter ego' theory of liability.").[7]  In the absence of any veil piercing allegations, OPL cannot be liable because it did not employ the front desk employees at the Jupiter Beach Resort [DE 193] at ¶30, install the defective Oracle upgrade [DE 193] at ¶70, direct the operations at the Jupiter Beach Resort, or contract to manage the operations of the Jupiter Beach Resort in any way.  [DE 166-03] ¶70.  Stated another way, OPL did not print and deliver a folio so that it could be held liable under FACTA.

### B.  Overlapping Officers and Directors is Insufficient to Make OPL Liable for Purported Acts (which are disputed) of GHM, TRS, or Fee.

Plaintiff's continued attack on overlapping ownership, officers, and directors throughout this litigation is a red herring as to any OPL liability.  It is undisputed that OPL shares overlapping ownership, officers, and directors.  However, common decision-making between

---

[7] Even if a third party incorrectly used OPL's name, which is not an issue in this case because OPL was not a party to the contract with Oracle, accidental disregard of the corporate form is insufficient in to allege piercing the corporate veil without allegations of misuse.  <u>John Daly Enters., LLC v. Hippo Golf Co., Inc.</u>, 646 F. Supp. 2d 1347, 1353 (S.D. Fla. 2009) ("Under Florida law, mere failure to observe corporate formalities alone is not enough.  Rather, Florida courts require 'proof of *deliberate* misuse of the corporate form—tantamount to fraud—before they will pierce the corporate veil.'" (citation omitted)).  Here, there was no misuse, let alone deliberate misuse.

entities is insufficient to state an alter ego claim or create any liability for OPL here.  Fillmore E. BS Fin. Subsidiary LLC v. Capmark Bank, 552 Fed. Appx. 13, 15 (2d Cir. 2014) ("The complaint makes only generalized and conclusory allegations regarding common ownership, employees, management, control, and decisionmaking between Capmark and CFI. Such allegations are essentially a recitation of the legal standard and are plainly insufficient to state a claim of alter ego status. See Wehlage v. EmpRes Healthcare, Inc., 791 F. Supp. 2d 774, 782–83 (N.D. Cal. 2011) (generalized allegations of common decision-making, operation, and shared "officers, directors and employees" are insufficient to invoke the alter ego doctrine).").

Further, even if OPL were the parent of GHM, Fee, or TRS (which OPL undisputedly is not), the Supreme Court has stated simply that it is presumed that officers and directors wear their "subsidiary hats" when acting for the subsidiary or other entity. Greene v. Long Island R. Co., 280 F.3d 224, 234 (2d Cir. 2002) (internal marks omitted) ("[A]lthough [a] parent and subsidiary ha[ve] many of the same officers and directors, courts generally presume that the directors are wearing their 'subsidiary hats' and not their 'parent hats' when acting for the subsidiary." (quoting United States v. Bestfoods, 524 U.S. 51, 69 (1998))); see also Pearson v. Component Tech. Corp., 247 F.3d 471, 484 (3d Cir. 2001) ("Nor will liability be imposed on the parent corporation merely because directors of the parent corporation also serve as directors of the subsidiary." (citing Bestfoods, 524 U.S. at 69)).  In addition to the very clear presumption enunciated by the Supreme Court, Rich Ade has testified that officers and directors do not act in a capacity as an OPL officer or director, but as the officer, director, or owner of the legally distinct entity.  [DE 193] at ¶62.  Thus, overlapping officers and directors will never be sufficient in this case to set aside the legally distinct corporate entities.

### C.  No Other Theory Alleged in the Complaint is Supported by The Record.

### i. *"Central Operations Role" and "Central Receipt Generating Functions"*

To argue that Plaintiff should somehow be exempt from a veil-piercing theory so that he could hold a legally distinct entity liable, Plaintiff argued that it was OPL that owned and jointly operated the Jupiter Beach Resort and that OPL had a central receipt generation function. Indeed, in opposing OPL's Motion to dismiss, Plaintiff argued heavily—almost exclusively—that his allegations could support liability against OPL because "OPL centralized its administrative functions, including printing receipts, for all of its affiliated properties, including Jupiter Beach Resort."  [DE 80] at 10.  Plaintiff also argued that OPL is involved in "printing receipts, for all its affiliated properties."  [DE 80] at 10 (citing Second Amended Complaint, [DE 47], ¶¶16-17).  Plaintiff argued that OPL's centralized receipt generation function (**which undisputedly does not exist**) that was the "***sole activity at issue in this case***," [DE 80] at 4, and that "***OPL exercised centralized control over the receipt-generating process at the Jupiter Beach Resort.***"[8]  [DE 80] at 6.

This Court previously stated when cautiously denying OPL's Motion to Dismiss on these issues that:

> The Court does not, as all Defendants fear, disregard the distinct legal identities at issue in this case. Rather, the Court finds that the SAC states a plausible claim for liability against each Defendant. Plaintiff will bear the eventual burden to establish which specific Defendant, if any, is liable for the FACTA violation alleged.

Order [DE 116] at 13 (emphasis added).  Confronted with the undisputed reality that OPL has no involvement whatsoever with any of the "receipt generating functions," and that receipt

---

[8] This Court even found that allegation persuasive in denying the motion to dismiss. Order [DE 116] ("OPL provides the central operation role to" Oprock Defendants and GHM, and "[t]o that end, OPL publicly represents that its accounting and administrative functions, including those involved in generating FACTA violative receipts, are '[c]entralized' and 'work[ ] seamlessly together.'").

generating is not "centralized," but occurred locally at the Jupiter Beach Resort, for which OPL had absolutely no involvement, this Court must grant summary judgment for OPL because there is no "plausible claim for liability against" OPL.

### ii. Unitary Business Enterprise

Plaintiff attempts to plead OPL could be liable based on a theory that OPL and the Jupiter entities are part of a "unitary business enterprise."   [DE 47] at ¶10.  No relevant jurisdiction at issue in this case recognizes a unitary business theory to disregard corporate separateness or impose liability on OPL.  In Florida, it is well-settled that allegations of a unitary business principal are solely for use in connection with taxation schemes.  Brunner Enters., Inc. v. Dep't of Rev., 452 So. 2d 550, 553 (Fla. 1984) ("[W]e hold that out-of-state investment income earned by a foreign corporation doing business in Florida is only taxable under the Florida Corporate Income Tax Code if the Florida enterprise is part of a unitary business."); Roger Dean Enters., Inc. v. State, Dep't of Rev., 387 So. 2d 358, 363 (Fla. 1980) (noting that regulations, including Fla.Admin. Code Rule 12 C-1.15, "are directed primarily at determining whether a multistate taxpayer operates a 'unitary' business entirely subject to tax in Florida, or separate businesses in several states including Florida, as to which Florida may tax only the Florida business").  They do not create a separate means by which to set aside the corporate veil.  *Even a simple cursory search of Florida law reveals not a single reported case in Florida that contains both the words "veil" and "unitary."*[9]

Similarly, in other states, the "unitary business" concept is for apportioning income for taxation purpose.  F. W. Woolworth Co. v. Taxation & Rev. Dep't of State of N. M., 458 U.S.

---

[9] See also IGEN Int'l, Inc. v. Roche Diagnostics GmbH, 335 F.3d 303, 309 n.5 (4th Cir.2003) (applying Delaware law for the proposition that "the act of one corporation is not regarded as the act of another merely because the first corporation is a subsidiary of the other, or because the two may be treated as part of a single economic enterprise for some other purpose").

354, 362 (1982) ("The linchpin of apportionability for state income taxation of an interstate enterprise is the unitary-business principle." (quoting ASARCO Inc. v. Idaho State Tax Com'n, 458 U.S. 307, 319 (1982)) (internal marks omitted)); Exxon Corp. v. Wisc. Dep't of Rev., 447 U.S. 207, 223 (1980) ("If a company is a unitary business, then a State may apply an apportionment formula to the taxpayer's total income in order to obtain a 'rough approximation' of the corporate income that is 'reasonably related to the activities conducted within the taxing State.'" (quoting Moorman Mfg. Co. v. Bair, 437 U.S. 267, 273 (1978))).

And these principles are separate for good reason—permitting a "unitary business" theory as an end-around limitations of liability would gut the law and public policy considerations recognized in Florida and all other states that corporations and LLC's, save the most exceptional circumstance, must be considered as separate legal entities with their separate corporate forms observed and protected.

Even if a unitary business enterprise theory could conceivably be used to set aside corporate separateness, Plaintiff's factual allegations are unsupported by the record.  This Court found the following allegations helpful in denying OPL's motion to dismiss:

> According to Plaintiff, "[a]t all times relevant herein, Defendants were acting jointly as a unitary enterprise utilizing the resources and legal name of Ocean Properties, Ltd., and by and though their agents, servants and/or employees, each of which were acting within the course and scope of their agency or employment, and under the direct supervision and control of the Defendants." Id. ¶ 43.

Order [DE 116], at 2.  Plaintiff and this Court now know though sworn discovery responses and OPL's corporate representative that there are no contracts between Jupiter Beach's owner (OpRock Jupiter Fee, LLC), management company (GHM Jupiter, LLC), and OPL.   [DE 130-1; 130-3; 130-5; 193]. OPL's Answers to Interrogatories, [DE83-2].  OPL does not employ anyone

at the Resort, and OPL did not directly or indirectly supervise or control the activities of Jupiter Beach. Thus, because a "unitary business" theory is not a basis to set aside the doctrines of corporate separateness, and because the evidence undisputedly shows OPL had no agents, servants, employees acting in the scope of agency or employment at the Resort or at PCFSI, OPL cannot be liable.

### iii. Direct Liability Theory

Plaintiff has also said he is relying on a theory of "direct liability" and at the motion to dismiss stage and cited cases stating that defendants are subject to direct liability regardless of alter-ego or veil-piercing liability. [DE 80] at 9. First, those cases do not apply binding law in this Court and these cases contradict Florida law. Lambert v. Kazinetz, 250 F. Supp. 2d 908, 913 (S.D. Ohio 2003) (applying Ohio corporate law); [10] Graham v. Barolat, CIV.A.03-2029, 2004 WL 2668579, at *2 (E.D. Pa. Nov. 17, 2004) (applying doctrine of corporate negligence enunciated by Pennsylvania Supreme Court).

Second, the cases Plaintiff does cite from this jurisdiction for "direct" liability expressly contemplate such liability only where a parent-subsidiary relationship, which was not pleaded nor has or can be proven here. There is no fact that OPL is the parent of the entities that own the Jupiter Beach Resort or any other ownership entity relevant in this case. [DE 80] at 10 (citing AA Suncoast Chiropractic Clinic, P.A. v. Progressive Am. Ins. Co., 8:15-CV-2543-T-26MAP, 2016 WL 740719, at *1 (M.D. Fla. Feb. 25, 2016)). Indeed, Plaintiff has admitted that (and the evidence is undisputed that) there is no parent-subsidiary relationship between OPL and GHM, Fee, or TRS. [DE 38]. This admission precludes any possible claim of "Direct Liability" in this

---

[10] Lambert is separately distinguishable because it held an officer personally liable for his own tortious act. Plaintiff does not seek to impose liability on an individual. Lambert v. Kazinetz, 250 F. Supp. 2d 908, 913 (S.D. Ohio 2003)

case.

### iv. Joint Ownership and Management

Plaintiff also alleges that the defendants "own and jointly manage that hotel property." [DE 47] at ¶12. First, a "joint" enterprise theory would fail because FACTA does not create a "joint" enterprise theory like other statutory schemes, such as the Fair Labor Standards Act which creates a joint enterprise theory. See, e.g., Gonzalez v. Old Lisbon Rest. & Bar L.L.C., 820 F. Supp. 2d 1365, 1369 (S.D. Fla. 2011) (applying test for FLSA claim for establishing enterprise coverage under 29 U.S.C. § 209(r); dismissing complaint, and finding there is no authority for the proposition that simply because two companies are being run by the same managing member that those two companies comprise a joint enterprise).

Even if FACTA did create a joint enterprise theory like the FLSA claims in Gonzalez, which FACTA undisputedly does not, Plaintiff's allegations are not supported by the evidence. It is undisputed throughout discovery that OPL does not own and has no contract to operate or manage Jupiter Beach. [DE 130-1; 130-3; 130-5; 193]. Contrary to Plaintiff's allegations, the only evidence of management points exclusively to GHM Jupiter, LLC, which has an "exclusive" management contract to manage the day-to-day operations of the Jupiter Resort. See GHM's Management Agreement [DE 76-1] at CM/ECF 12 ("Management Company shall have the exclusive authority and responsibility for the day-to-day management of the Hotel for and during the Term, subject to the terms and conditions of this Management Agreement."). And because the management contract is between GHM and TRS only, and does not include OPL, a "joint" venture theory fails. See, e.g., Jackson-Shaw Co. v. Jacksonville Aviation Auth., 8 So. 3d 1076, 1089 (Fla. 2008) (to create a joint venture, the contract must contain certain elements, none of which are present here). Here, there is simply no contract.

#### iv. Agency

Plaintiff's reliance on an agency theory to support a vicarious liability claim is fatally flawed.  First, Plaintiff misconstrues which parties are the principal and the agent in the alleged agency relationship.   A vicarious liability theory predicated on agency requires a principal's control over its agent so that the principal can be held liable.  Plaintiff relies on the position that OPL can be held vicariously liable because OPL acted with authority from Oprock Jupiter Fee, Oprock Jupiter TRS, and GHM Jupiter.  [DE 47] at ¶44. *This turns the idea of vicarious liability here on its head*.  Thus, OPL would be the agent, but no act of OPL giving rise to such liability is alleged or true.[11]  "[T]he doctrine of vicarious liability takes a party that is free of legal fault and visits upon that party the negligence of another." Prager v. FMS Bonds, Inc., Fed. Sec. L. Rep. P 95809 (S.D. Fla. 2010) (quoting Am. Home Assur. Co. v. National Railroad Passenger Corp., 908 So. 2d 459, 468 (Fla. 2005)) (emphasis added).

Alternately, OPL cannot be the principal because OPL did not have authority to confer upon an agent who would have then committed a purportedly violative act.  OPL was not the owner, operator, manager of the Resort, and OPL was not contracted with any entity that would permit OPL to contract on the Resort's behalf.  As with the other theories Plaintiff employs to suggest that OPL as a non-owner, non-parent, non-contracted entity could be a proper party, Plaintiff's conclusory allegation for vicarious liability fails.

Second, even if an agency theory could set aside the doctrine of corporate separateness, it still requires allegations tantamount to mere instrumentality.  For example, in State v. Am. Tobacco Co., 707 So. 2d 851, 854 (Fla. 4th DCA 1998), the court stated:

> The elements of an agency relationship under Florida law are (1) acknowledgement by the principal that the agent will act for it, (2)

---

[11] OPL has no central receipt generation function or hand delivered a folio to Plaintiff.

> the agent's acceptance of the undertaking, and (3) control by the
> principal over the actions of the agent. See Goldschmidt v.
> Holman, 571 So. 2d 422, 424 n. 5 (Fla. 1990) (citation omitted).
> The issue of control is critical to the determination of agency. See
> Parker v. Domino's Pizza, Inc., 629 So. 2d 1026 (Fla. 4th DCA
> 1993).

Am. Tobacco Co., 707 So. 2d at 854.  Such control could be created through a parent-subsidiary

relationship with allegations similar to a veil piercing theory:  "the parent corporation, to be

liable for its subsidiary's acts under the . . .  agency theory, must exercise control to the extent

the subsidiary manifests no separate corporate interests of its own and functions solely to achieve

the purposes of the dominant corporation."  Id. at 855 (quoting Vantage View, Inc. v. Bali East

Dev. Corp., 421 So. 2d 728 (Fla. 4th DCA 1982)) (internal quotations marks omitted) (emphasis

added); Baker v. Raymond Int'l, Inc., 656 F.2d 173, 181 (5th Cir. 1981).   Absent any allegations

that OPL exercised the type of veil-piercing control, which there is none, Plaintiff failed to allege

and bring evidence to support an agency relationship necessary to disregard the doctrine of

corporate separateness.

Based on the undisputed facts, OPL was never a principal with an employee, a subsidiary

company, a contractor, or an agent of any type to control because OPL had no involvement in the

implementation of the Oracle's defective upgrade or in delivering the folios to guests.

### iii.  Reliance on Website and Marketing  Materials is Insufficient to Pierce the Veil.

Plaintiff's reliance on a shared marketing website to attempt to impose liability is

likewise improper for two reasons.  First, as previously outlined in OPL's Second Motion to

Dismiss and Reply, Plaintiff misstates the contents of the "Ocean Properties and Affiliates"

shared marketing website. Second, as a matter of law, references and representations made on a

marketing website cannot form the basis for piercing the veil (which has not even been plead

here) or any type of theory that disregards corporate separateness or attempts to create liability

for one of the parties listed on the shared marketing website for acts of other listed parties. Typically a court dismisses claims for liability of one party for another's actions based on their both being part of a shared marketing website.

Dow v. Abercrombie & Kent Int'l, Inc., 2000 WL 688949 (N.D. Ill. May 24, 2000), is instructive. Plaintiffs sued Abercrombie for assault and robbery suffered while plaintiffs were on safari in Kenya. Because Abercrombie never had an office or directly provided safari services, the plaintiffs sued Abercrombie asserting that it controlled the activities of the persons that were providing the actual safari services. Plaintiffs based their claim almost exclusively on statements made on Abercrombie's website that offered to provide safari experience in Kenya. Plaintiffs pointed to and the court acknowledged numerous detailed statements made on Abercrombie's website, www.Abercrombiekent.com, to support their allegation that Abercrombie operated and controlled the safari and a separate entity known as A & K Kenya. These website references found at pages *3 and *4 of the court's opinion show that the statements on Abercrombie's website are far more specific and inculpatory than the misstated website references cited by Plaintiff here. In addition, unlike here, the Abercrombie plaintiffs also alleged many other relevant facts based on emails, phone calls and verbal statement beyond the website to assert Abercrombie's liability.

The Court granted Abercrombie's 12(b)(6) motion, dismissed the plaintiffs' complaint with prejudice, and entered a judgment against the plaintiffs holding that: "The fact that A & K Kenya lists a website owned and operated by A& K International as its own is not probative of A & K International's control over A & K Kenya. Sharing a website is akin to sharing a logo, which is insufficient to evince control." Here it has been proven that OPL is just one company of many on the OP and affiliates website.

Similarly, in J.L.B. Equities, Inc. v. Ocwen Financial Corp., 131 F. Supp. 2d. 544 (S.D.N.Y. 2001), a plaintiff tried to allege facts showing that Ocwen Financial exerted control over its subsidiary Ocwen Bank to establish in personam jurisdiction. As here, the plaintiff was unable to allege any facts directly showing that Ocwen Financial controlled Ocwen Bank and relied upon Ocwen Financial's web page which concededly treats Ocwen Financial and Ocwen Bank as one. The Court dismissed the case, holding:

> However, the Court is not persuaded that a failure to distinguish between parent and subsidiary on a web page is sufficient to show that the parent controls the subsidiary's marketing and operational policies. An advertising strategy deciding not to present to its consumers the existence of a parent-subsidiary relationship is not equivalent to a showing that the parent corporation exercises any control over its subsidiary's operational or marketing activities.

Id. at 550.

In Reers v. Deutsche Bahn AG, et al., 320 F. Supp. 2d 140, 157-58 (S.D. N.Y. 2004), the plaintiff alleged that Deutsche Bahn AG controlled the defendant subsidiaries and should be liable for personal injuries suffered in a railcar fire. In support of the plaintiff's allegations of control, plaintiff pointed to the defendants' overlapping directors and officers, the parent's total financial support of its subsidiaries, and the fact that the parent presented several corporations on its website in a unified fashion and as part of a shared marketing effort.

The court rejected the website references as providing any evidence of the parent's control over the other entities. In dismissing the complaint, the court held:

> With respect to marketing policies, the fact that subsidiaries share a logo, or that the parent decides to present several corporations on a website in a unified fashion, is insufficient to show lack of formal separation between two entities.

Id. at 178.

22

Indeed, in virtually all cases where plaintiffs have attempted to rely on language in a shared marketing website as the sole factual basis to state a claim against a defendant their cases have been dismissed or their claims otherwise denied.[12]  While most of these cases were decided in  the context of motion to dismiss, these court's reasoning is equally of not more applicable in the context of a summary judgement, where, as here, it has been further proved that OPL does not operate or control the website and is simply one of over a hundred separate and distinct hotel entities properties marketed only by PCFSI.

Second, even if representations on a marketing website could have possibly created an issue as to whether OPL had a "central receipt generating function" as Plaintiff misleadingly

_____

[12] Nat'l Gear & Piston, Inc. v. Cummins Power Sys., LLC, 975 F. Supp. 2d 392,403 (S.D. N.Y. 2013) (Description of subsidiary in a press release and on parent's website as a "unit," and additional allegations of overlapping management and the parent being the sole source of capital in the subsidiary "taken as true are insufficient to support the allegation that CPS and Cummins function as a single entity"; Cummins' 12(b)6) Motion granted and complaint dismissed); Collazo v. Enter. Holdings, Inc., 832 F. Supp. 2d 865, 871 (N.D. Ind. 2011) (allegations that Enterprise website does not evidence a parent-subsidiary relationship, and shows that innumerable and all Enterprise entities used a common logo, trademark and the like, along with a shared contact and customer support information "falls far short" of making the required allegations to show Enterprise exerts control over the Enterprise locations referenced on the website; Motion to Dismiss granted); Carswell v. Air Line Pilots Ass'n Int'l, 540 F. Supp. 2d 107, 122 (D. D.C. 2008) (Defendant national parent union sharing website with subsidiaries does not evidence control over the subsidiaries or a principal/agent relationship; parent's 12(b)(6) motion granted); Wady v. Provident Life and Accident Ins. Co. of Am., 216 F. Supp. 1060, 1068 (C.D. Cal. 2002) (granting summary judgment against plaintiff where primary evidence of parent's control over subsidiary was claims forms, written correspondence and marketing materials where the parent referred to its subsidiaries using pronouns such as "we," "us," or "our" and shared a number of corporate officers and directors); Freundensprung v. Offshore Technical Servs., Inc., 379 F.3d 327, 346-47 (5th Cir. 2004) ("dismissal of complaint proper as various [website] printouts" alleging control of the subsidiary by the parent indicated only that the parent and subsidiary shared a normal corporate relationship and were "insufficient to overcome the presumption of corporate separateness" and state a claim); Andersen v. Ridge Tool Co and Emerson Electric Co., 2008 WL 1908716, *5  (E.D. Ky. April 30, 2008); Esniton Records, Inc. v. Jonestm, Inc., 2008 WL 2415997, *4  (N.D. Tex. June 16, 2008); Sol Melia, S.A. v. Fontana, 67 So. 3d 1226, 1227 (Fla. 3d DCA 2011) (Website listing of parent and subsidiaries as all being part of  "North American Division" and alleging that they all share common directors, insufficient to plead liability of parent for subsidiary).

alleged and argued, the undisputed evidence conclusively proves OPL does not manage or control the marketing websites or their contents.  [DE 193] at ¶8.  Plaintiff alleged that OPL operates the website, but that is flatly contradicted by the evidence in this case.  OPL has produced to Plaintiff the 2015 assignment of the trademark of the OPAL Collection to PCFSI.  [DE 193-3].  Plaintiff learned through the deposition of OPL's corporate representative that the PCFSI maintains the website, registers the domains, and holds the legal assignment of the OPAL Collection Trademark and is the sole entity that uses this intellectual property.  [DE 164-9; 166].

Further, Plaintiff's reliance on any "OPAL Collection" guarantees by properties in the OPAL Collection to their guests is misleading and does not impose liability on the legally distinct entity OPL.  OPL does not own or operate any hotels in the OPAL collection.  [DE 193] at ¶18.  Instead, PCFSI designates the hotels to be part of the loose affiliation of OPAL hotels, which is used for marketing.  [DE 193] at ¶34.  As previously stated, OPL assigned the rights to the OPAL collection to PCFSI, an 80-employee company that manages the website, determines which hotels become part of the marketing moniker "OPAL Collection."  [DE 193-3].

## II.  This Court Lack's Article III Standing as to OPL Because the Purported Injury is not Fairly Traceable to OPL.

OPL re-incorporates all arguments in the Opposition to Plaintiff's Motion for Class Certification relating to Article III standing, which this Court has not yet ruled upon.  For brevity's sake, OPL will not re-state its arguments herein with the exception that this Court does not have Article III standing over OPL because the purported harm to Plaintiff (which is disputed) is not fairly traceable to OPL.  Specifically, Plaintiff's purported class against Ocean Properties, Ltd. fails Article III's standing requirement that "there must be a causal connection between the injury and the conduct complained of—the injury has to be fairly traceable to the challenged action of the defendant, and not the result of the independent action of some third

party not before the court." <u>Lujan v. Defs. of Wildlife</u>, 504 U.S. 555, 560 (1992) (citations and internal marks omitted).   In short, OPL took no action that could have resulted in the harm Plaintiff complains of—the risk of identity theft due to an unmasked expiration date.   OPL cannot have caused the unmasking of expiration dates at any hotel because it is undisputed that OPL did not have the ability to require the defective software upgrade at the Jupiter Beach Resort.   OPL did not perform the software upgrade—PCFSI gave Oracle access to install the upgrade.   No OPL employee delivered the purportedly defective folios at any hotels.   Neither OPL nor its employees contracted on the Jupiter Beach Resort or any of the 11 Other Hotels' behalf.   There is no harm that can be traced to any conduct by OPL, and OPL must be dismissed.

## <u>CONCLUSION</u>

For the reasons stated above and those stated in GHM Jupiter, LLC's Motion for Summary Judgment [DE 325], Ocean Properties, Ltd. respectfully requests this Court grant final summary judgment.

Respectfully submitted this 22nd day of September 2017.

> SHUTTS & BOWEN, LLP
> 200 South Biscayne Boulevard
> Suite 4100
> Miami, Florida 33131
> Telephone: 305-347-7305
> Facsimile: 305-381-9982
> *Attorneys for Ocean Properties, Ltd. and*
> *GHM Jupiter, LLC*
>
> By:   s/ Jake Monk, Esq.
>       Frank A. Zacherl
>       Florida Bar No. 868094
>       fzacherl@shutts.com
>       Jake Monk
>       Florida Bar No. 100321
>       jmonk@shutts.com

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on September 22, 2017, I electronically filed the foregoing document with the Clerk of the Court using CM/ECF.  I also certify that the foregoing document is being served this day on all counsel of record or pro se parties identified below in the manner specified, either via transmission of Notices of Electronic Filing generated by CM/ECF or in some other authorized manner for those counsel or parties who are not authorized to receive electronically Notices of Electronic Filing.

s/ Jake Monk, Esq.
*Counsel for Ocean Properties and GHM*

## SERVICE LIST

Keith Keogh
Michael R. Karnuth
Keogh Law, LTD
55 W. Monroe Street
Suite 3393
Chicago, IL 60603
312-726-1092
Keith@KeoghLaw.com
MKarnuth@KeoghLaw.com

Bret Leon Lusskin, Jr.,
Bret Lusskin, P.A.
20803 Biscayne Blvd.
Suite 302
Aventura, FL 33180
954-454-5841
blusskin@lusskinlaw.com

Scott David Owens
Patrick Crotty
Sean Holas
Scott D. Owens, P.A.
3800 S. Ocean Drive
Suite 235
Hollywood, FL 33019

954-589-0588
scott@scottdowens.com
patrick@scottdowens.com
sean@scottdowens.com

Stuart I. Grossman, P.A.
Jason K. Kellogg, P.A.
Victoria J. Wilson, Esq.
LEVINE KELLOGG LEHMAN
SCHNEIDER + GROSSMAN LLP
201 South Biscayne Boulevard, 22nd Floor
Miami, FL 33131
Telephone:  (305) 403-8788
Facsimile:  (305) 403-8789
sig@lklsg.com
jk@lklsg.com
vjw@lklsg.com

MIADOCS 15361879 3