JUSTIN BOUTON,

      Plaintiff,

vs.

OCEAN PROPERTIES, LTD, *et al.*,

      Defendants.

_____/

## OMNIBUS ORDER ON MOTIONS FOR SUMMARY JUDGMENT AND *DAUBERT* MOTIONS TO EXCLUDE EXPERT TESTIMONY

**THIS CAUSE** is before the Court upon Plaintiff Justin Bouton's *Daubert* Motion to Exclude Defendant's Proposed Expert Testimony, ECF No. [298] ("Plaintiff's *Daubert* Motion"), Defendants' Motion to Strike Plaintiff's Expert Witness Don Coker, ECF No. [300] ("Defendants' *Daubert* Motion"), Oprock Jupiter Fee, LLC and Oprock Jupiter TRS, LLC's (collectively "Oprock Defendants") Motion for Summary Judgment, ECF No. [324] ("Oprock Defendants' Motion"), Defendant GHM Jupiter, LLC's Motion for Summary Judgment, ECF No. [325] ("GHM's Motion"), and Defendant Ocean Properties, Ltd.'s Motion for Summary Judgment, ECF No. [326] ("OPL's Motion"). The Court has carefully reviewed the Motions, the record, all supporting and opposing filings, the exhibits attached thereto, and is otherwise fully advised. For the reasons that follow, both Plaintiff's *Daubert* Motion and Defendants' *Daubert* Motion are granted in part and denied in part. As to the issues on summary judgment, GHM's Motion is granted in part and denied in part, OPL's Motion is granted, and the Oprock Defendants' Motion is granted in part and denied in part.

## I. BACKGROUND[1]

### A. Plaintiff's Claims

Plaintiff Justin Bouton ("Plaintiff") brings a lawsuit against Defendants for their alleged violation of the Fair and Accurate Credit Transactions Act ("FACTA") amendment to the Fair Credit Reporting Act, 15 U.S.C. § 1681 *et seq.*, as amended ("FCRA"). *See* ECF No. [47] at ¶ 1 ("Second Amended Complaint"). In the Second Amended Complaint, Plaintiff claims that Defendant Ocean Properties, Ltd ("OPL") represents that it develops, owns and operates hotels in several states, including Florida. *Id.* at ¶ 5. Defendant Oprock Jupiter Fee, LLC ("Oprock Fee") owns the property Jupiter Beach Resort & Spa ("Jupiter Beach Resort"), the hotel at which Plaintiff allegedly received a FACTA non-compliant receipt. *Id.* at ¶ 6. Defendant Oprock Jupiter TRS, LLC ("Oprock TRS") leases the Jupiter Beach Resort property from Oprock Fee. *Id.* at ¶ 7. Defendant GHM Jupiter, LLC ("GHM") manages the Jupiter Beach Resort. *Id.* at ¶ 8. Plaintiff claims that all Defendants are "privately-owned companies, which are directly and indirectly owned and operated by Tom Walsh and his children," and that "[t]hrough a byzantine ownership and management structure, Defendants operate their hotel businesses as a unitary enterprise." *Id.* at ¶¶ 9-10. Specifically, Plaintiff alleges that "Defendants share common owners, managers, addresses, and resources, and use the OPL legal name when describing its business operations in a singular fashion." *Id.* at ¶ 10. According to Plaintiff, "Defendants were acting jointly as a unitary enterprise utilizing the resources and legal name of [OPL], and by and

---

[1] In their Reply memoranda, Defendants ask the Court to deem all facts within their respective Statements of Undisputed Facts admitted because Plaintiff did not follow Local Rule 56.1 in that he failed to respond to each individually numbered paragraph. The Court agrees that Plaintiff did not follow the requirements of the Local Rules. Instead, Plaintiff filed a competing Statement of Undisputed Facts. While this format is not helpful when analyzing whether any material issues of fact exist, Plaintiff's actions are not tantamount to a complete failure to respond. Plaintiff has still challenged multiple facts by preparing his own competing statement. For this reason, the Court will not deem Defendants' facts admitted. Plaintiff, however, is reminded that he must follow all Local Rules and any failure to do so in the future will result in sanctions.

though their agents, servants and/or employees, each of which were acting within the course and scope of their agency or employment, and under the direct supervision and control of the Defendants." *Id.* at ¶ 43.

## B. OPL

The Walsh family and Walsh family interests own more than 100 hotel-owning companies, including OPL. *See* ECF No. [193] at ¶ 14. For the past 25 years, the Walsh family has formed numerous corporations and limited liability companies to own and hold property for the purpose of banking lending requirements, including formation of single-purpose and special-purpose entities ("SPE") for bankruptcy remoteness and limiting liability. *Id.* at ¶¶ 56, 58. As the multi-tiered SPE structure became a common requirement in acquisition financing or re-financing, OPL divested itself of multiple hotels, and the Walsh family formed and owns Portsmouth Corporate Financial Services, Inc. ("PCFSI") in 1995. *Id.* at ¶¶ 56-57.

OPL is a privately-held company owned by Walsh siblings Michael, Mark, William, Suzanne and Patrick. *See* ECF No. [125-3]. OPL's directors are Michael, Mark, and William Walsh. *Id.* Its officers are Michael Walsh (President), Mark and William Walsh (Vice Presidents), Patrick Walsh (Secretary) and Richard Ade ("Ade") (Executive Vice President). *Id.* OPL maintains two corporate offices with one located at 1001 East Atlantic Avenue in Delray Beach, Florida and the other at 1000 Market Street in Portsmouth, New Hampshire. *See* ECF No. [47-5]; ECF No. [290-6] at 14-16.

For the last several years, OPL, through its President Mike Walsh and its employees, has assisted in local marketing of the Marriott Delray Beach and has provided clerical support services for this hotel. *See* ECF No. [193] at ¶¶ 27, 29. The only two hotels owned and operated by OPL during the relevant timeframe were the Marriott Delray Beach and the Holiday Inn

Lakeside, and neither of them had any FACTA violations during this period. *See* ECF No. [290-13] at 133, 140, and 142. OPL does not have and has not had contracts to operate or manage any hotels other than the Marriott Delray Beach between March 1, 2015 and the present. *See* ECF No. [130-05] at ¶13. In OPL's Motion, it contends that its employees have no duties or employment obligation to, and do not perform any work or services at, any other hotel or property including the Jupiter Beach Resort. *Id.* at ¶30. However, as explained below, this is a disputed issue of fact.

OPL does not directly or indirectly own Oprock Fee, Oprock TRS, or GHM. *See* ECF No. [130-5] at ¶ 4; ECF No. [193] at ¶ 16; and ECF No. [24-3] (Recitals A and B). There are no contracts between Oprock Fee, GHM and OPL, and OPL has no contract to operate or manage the Jupiter Beach Resort. *See* ECF Nos. [130-1]; [130-3]; [130-5]; and [193]. The $295,000,000 mortgage on Jupiter Beach Resort and properties of other Oprock entities appearing in the public records of Palm Beach County do not refer to OPL and are not signed by any Walsh family member. *See* ECF No. [66-4]. OPL does not carry the hotel or any loan related to it on its financial statements. *See* ECF No. [83-7], [4-30].

OPL states that it did not have any direct or indirect involvement in the FACTA violation at the Jupiter Beach Resort as its employees never worked there, but Plaintiff submitted evidence suggesting that OPL has been involved with the resort in some capacity. Starting in 2005, OPL acquired the Jupiter Beach Resort, renovated it and reopened the resort, obtaining building permits in 2005, 2006, and 2007. *See* ECF No. [47-4];[2] ECF Nos. [80-2], [80-3], and [80-4]. Although Oprock

---

[2] Michael Walsh disputes the accuracy of the content on the "About Us" page on www.oplhotels.com; however, OPL's corporate representative, Ade, testified that OPL owned the website and, even though it had the right to control the website, it delegated that responsibility to non-party PCFSI. *See* ECF No. [290-6] at 108-113. OPL's statements on its websites are admissions by a party opponent regardless of whether OPL had its own employees post that content onto the internet, whether it authorized PCFSI to create the content for its website, or it had an agency relationship with PCFSI through which it delegated

Fee has been the owner of the resort since 2007, during the relevant timeframe, OPL publicly represented on its website www.oplhotels.com that the Jupiter Beach Resort was one of its properties.  *See* ECF No. [47-13].  More specifically, the website states that "*Ocean Properties' resort and hotels* on Florida's popular East Coast attract both business travelers and leisure seekers from the United States, Europe and Latin America.  Sophisticated and multicultural, *they range from the elegant Jupiter Beach Resort and Spa*, immediately north of Palm Beach and easily accessible to Palm Beach International Airport, and the Marriott Delray Beach . . ."  *Id.* (emphasis added).  Thus, OPL's website represents that the Jupiter Beach Resort is part of its collection of hotels.[3]  Other marketing materials bearing the OPL logo and name also suggest the same.  *See* ECF No. [47-19] (bearing the OPL and OPAL collection logos, stating "Ocean Properties has your travel story covered," identifying Jupiter Beach Resort as part of the hotel collection, and listing Kerry Morrisey from "Ocean Properties, Ltd." at "Kerry.Morrisey@oplhotels.com" as the media contact).[4]  OPL's website, www.oplhotels.com, also contains a Terms of Use page, which states OPL is "committed to protecting" customer privacy including customer "financial information (such as credit card number

---

all website management responsibility to PCFSI.  *See* Fed. R. Evid. 801(d)(2) ("A statement that meets the following conditions is not hearsay: [t]he statement is offered against an opposing party and (A) was made by the party in an individual or representative capacity . . . (C) was made by a person whom the party authorized to make a statement on the subject; (D) was made by the party's agent or employee on a matter within the scope of that relationship and while it existed . . .").  While Michael Walsh may dispute the accuracy of the admission, that goes to the weight of the evidence – an issue to be determined by a jury, not the Court on summary judgment.

[3] OPL's website does not say the Jupiter Beach Resort is owned by an affiliated entity.  The website is written in the possessive – "Ocean Properties' resorts and hotels," representing to the public that Jupiter Beach Resort belongs to OPL.  While it may be coincidental, the only other hotel referenced here is the Marriott Delray Beach – a hotel that OPL admits to owning and managing.

[4] OPL argues that it assigned its rights to the OPAL trademark to PCFSI and that only PCFSI has the right to use it. However, at his deposition, Ade did not dispute the authenticity of this brochure.  *See* ECF No. [290-06] at 152-154.  And, although Michael Walsh disputes that OPL ever marketed the OPAL collection of hotels, the terms and conditions for the OPAL collection website do not allow its content to be modified, reproduced, transmitted, distributed, disseminated, sold, published, broadcast or circulated "without the written consent of Ocean Properties, Ltd."  *See* ECF No. [47-20]. A genuine issue of fact exists as to OPL's involvement in the OPAL collection of hotels, including the Jupiter Beach Resort.

and expiration date, etc." and that OPL "is committed to the security of the data collected." *See* ECF No. [47-12].

### C. PCFSI

PCFSI is a consulting and services provider in the areas of accounting, financial, information technology, human resources, administrative, advertising and other services to hotel and property management companies and sometimes directly to hotel and property owners. *See* ECF No. [193] at ¶60. GHM is one of PCFSI's clients. *Id.* PCFSI provides its services to entities both associated with the Walsh family and to persons and entities not associated with the Walsh family. *Id.* at ¶60. It does not own or operate hotels or real estate. *Id.* at ¶60. OPL does not direct the operations of PCFSI and it is not a subsidiary of OPL. *Id.* at ¶62; ECF No. [125-3]; ECF No. [193] at ¶25.

### D. Oprock Fee and Oprock TRS

Oprock Fee owns the Jupiter Beach Resort and, in turn, leases the hotel to Oprock TRS. *See* ECF No. [324] at 3; ECF No. [335] at 2.[5] The Oprock Defendants, formed on May 13, 2007, are single-purpose entities with a sole purpose of real estate investment. *See* ECF No. [324-1] at ¶ 5; ECF Nos. [47-1], [47-2]. The corporate structure of the Oprock Defendants is as follows: Rockwood Ocean, LLC owns 100% of Oceanrock Master Mezz, LLC; Oceanrock Master Mezz LLC owns 100% of Oprock Jupiter Master Mezz LLC; Oprock Jupiter Master Mezz LLC owns 100% of Oprock Fee; and Oprock Fee owns 100% of Oprock TRS. *See* ECF No. [335] at 3; ECF No. [324-1]. The Walsh family interests own 8% of Rockwood Ocean

---

[5] In his Response, Plaintiff refers the Court to language within the lease agreement between Oprock Fee and Oprock TRS and purports to attach a copy of the lease agreement as Exhibit 3. *See* ECF No. [335] at 2-3. However, Exhibit 3 is not the lease agreement between Oprock Fee and Oprock TRS. *See* ECF No. [335-3]. Rather, it is the management agreement between Oprock TRS and GHM. *Id.* The Court's review of the exhibit failed to locate a § 7.1.1 within the document or the language quoted by Plaintiff. It appears that Plaintiff did not provide the Court with any evidence of the lease agreement to support his statement.

LLC. ECF No. [324]. The remaining 92% is owned by unrelated Rockwood interests that are not directly or indirectly owned, managed, or controlled by any member of the Walsh family. ECF No. [324-1] at ¶ 6. Mark Walsh is the Vice President of Oprock Fee while Oprock Jupiter Master Mezz is its managing member. *See* ECF No. [290-20]. Similarly, Mark Walsh is the Vice President of Oprock TRS while Oprock Fee is its managing member. *See* ECF No. [290-21]. Both Oprock Fee and Oprock TRS have the same principal place of business located at 50 California Street, Suite 3000, San Francisco, California. *See* ECF Nos. [290-20], [290-21]. Both entities also have the same mailing address as GHM: 1000 Market Street, Portsmouth, New Hampshire. *Id.* The Oprock Defendants have the same mailing address as GHM because GHM runs the day-to-day operations of the Jupiter Beach Resort under the management agreement, as explained below. *See* ECF No. [324-1] at ¶ 8. Their Vice President, Mark Walsh, works out of OPL's office located at 1001 East Atlantic Avenue in Delray Beach, Florida. *Id.* The Oprock Defendants have never used OPL's name or otherwise made any representations that OPL or GHM are their agents. *See* ECF No. [324-1] at ¶ 9. They also do not have any contracts with OPL. *Id.* at ¶ 8. Following the incorporation of the Oprock Defendants, in September of 2007, Oprock TRS obtained ownership over the fictitious name "Jupiter Beach Resort."[6] *See* ECF No. [335-5]. Plaintiff's hotel folio, as further discussed below, contained the "Jupiter Beach Resort" name. *See* ECF No. [251-2].

### E. The GHM Management Agreement

---

[6] Plaintiff's Statement of Undisputed Facts states that both Oprock Defendants obtained ownership of the fictitious name in September of 2007. Based on the Court's review of the attached exhibit, it appears that only Oprock TRS was identified as the owner. *See* ECF No. [335-5]. To the extent that both entities may have acquired ownership over the fictitious name in 2017 while this lawsuit was underway, such evidence is not probative of the facts as they existed during the alleged FACTA violation.

On July 2, 2017, Oprock TRS granted GHM the exclusive right to manage and operate the Jupiter Beach Resort pursuant to a management agreement. *See* ECF No. [324-1] at 6-80. Specifically, the management agreement gives GHM the exclusive authority and control over the daily management of the hotel as follows: "Lessee [TRS] hereby engages Management Company [GHM] as an independent contractor to supervise, direct and control the management and operation of the Hotel and the Management Company shall have the exclusive authority and responsibility for the day-to-day management of the Hotel for and during the Term. . ." *Id.* at § 2.01. It further provides:

> The Management Company shall have complete discretion and control and exclusive authority and responsibility for the day-to-day management of the Hotel, free from interference, interruption or disturbance, in all matters relating to management and operation of the Hotel, including without limitation, charges for rooms and commercial space, credit policies, food and beverage services, employment policies, receipt, holding and disbursement of funds, maintenance of bank accounts, procurement of Inventories, supplies and services, promotion and publicity and, generally, all activities necessary for operation of the Hotel . . .

*Id.* at § 2.03(A).

Within the management agreement, TRS agreed that GHM would "have the right to manage and operate the Hotel during the Term free from hindrance, ejection or molestation by Lessee or other party claiming under, through or right of" TRS. *Id.* at § 11.01. The agreement also identifies GHM as an independent contractor and disclaims the creation of "any form of agency, a partnership, or joint venture or any other relationship between [TRS and GHM] or their successors in interest." *Id.* at § 20.03.

As to the personnel employed at the Jupiter Beach Resort, TRS and GHM agreed as follows:

> All personnel employed at the Hotel shall at all times be the employees of the Management Company and/or the employees or one or more third parties designated by the Management Company and approved by Lessee . . .

> Management Company shall have absolute discretion to hire, promote, supervise, direct and train all employees at the Hotel, to fix their compensation, benefits, and, generally establish and maintain all policies relating to employment . . .

*Id.* at § 14.01.

Oprock TRS also retained the right to terminate the management agreement in the event of direct or indirect transfer or assignment of the agreement by GHM that "would result in fewer than four (4) of the following seven individuals: William Walsh, Patrick Walsh, Michael Walsh, Mark Walsh, Rich Ade, Tom Varley, Andy Berger continuing to have full time senior management positions with" GHM. ECF No. [92-3] at § 18.01(A). The lease agreement between the Oprock Defendants is subordinated to the management agreement. *See* ECF No. [324] at 83 ("The Operating Lease is and shall be subject and subordinate in all respects to the operation and effect of the Management Agreement and to all renewals, modifications, consolidations, replacements and extensions thereof.").

### F. FACTA Knowledge

This lawsuit contains one count alleging a FACTA violation by all Defendants. GHM admits it had "industry knowledge of FACTA through its LLC manager Rich Ade." ECF No. [251-6] at 8. GHM further "admits the requirements of FACTA are well known" and it "does not dispute that it had knowledge of FACTA." *Id.;* ECF No. [348] at 7. OPL likewise knew about FACTA's requirements prior to December 22, 2015. *See* ECF No. [298-2]. By 2006, OPL converted and updated its credit and debit card platforms to FACTA compliant settings. *See* ECF No. [125-2] at ¶ 15. OPL was also previously sued for a FACTA violation in 2008. *See* ECF No. [290-6] at 116-118. Neither of the Oprock Defendants were aware of FACTA's requirements prior to this lawsuit. *See* ECF No. [324-1] at ¶ 12.

### G. The Software Upgrade

On November 5, 2015, Oprock TRS contracted with non-party Oracle to upgrade the software for Jupiter Beach's Property Management System ("PMS"). *See* ECF No. [290-19] at 23-25; ECF No. [290-8] at 224-225. Cliff Lazenby ("Lazenby") signed the contract with Oracle as "IT Director" on behalf of Oprock TRS.[7] *See* ECF No. [290-19] at 23-25. Lazenby,[8] at Oracle's urging, decided to allow the installation of the software upgrade to eliminate a potential credit card security vulnerability that Oracle recently identified in their Opera software. *See* ECF No. [193] at ¶ 70. Oracle assured Lazenby that certain credit card and debit card information would not be secured unless this update was immediately installed at the Jupiter Beach Resort.[9] *Id.* Based on Oracle's marketing materials, Lazenby understood Oracle would safeguard the security of the credit card data. *See* ECF No. [290-8] at 280. At Jupiter Beach Resort, they relied upon Oracle's sophisticated software, which was "advertised as the software that would protect the identities of individuals by complying with various regulations." ECF No. [290-10] at 126. On the other hand, Oracle's limited warranty only warrants that "[s]ervices will be provided in a professional manner consistent with industry standards." ECF No. [290-19] at 25. Oracle's contract does not provide any other specific warranties, such as compliance with

---

[7] The Oprock Defendants claim in their Statement of Undisputed Facts that they "did not know about the Oracle Upgrade" and "did not have any involvement in the decision to upgrade the software or in the implementation of the Oracle Upgrade." Despite this assertion, the contract for the Oracle software upgrade was entered into by Oprock TRS. *See* ECF No. [290-19] at 23-25. The Oprock Defendants also state that Cliff Lazenby has never been an employee of theirs, but he signed this contract on behalf of Oprock TRS as its "IT Director." This creates an issue of fact as to Lazenby's relationship to Oprock TRS *Id.*

[8] Although GHM and OPL characterize Lazenby as an employee of non-party PCFSI, Plaintiff raises an issue of fact involving Lazenby's relationship to multiple Defendants as he signed the Oracle contract as the "IT Director" of Oprock TRS and he repeatedly held himself out as the "IT Director" of OPL. *See* n. 4; ECF No. [290-16]; [290-8] at 41-42, 46-48, 60.

[9] GHM directs the Court to the Declaration of Ade for the proposition that: "Cliff Lazenby believed [the failure to allow the software upgrade] would have created the unnecessary risk to the security of certain guest's credit card transactions . . . ." *See* ECF No. [325] at 7. Similarly, GHM relies upon Ade's declaration as evidence of Lazenby's lack of knowledge of a potential software defect. *See* ECF No. [325] at 8. However, it is questionable that Ade can testify about what Lazenby did or did not believe or know.

FACTA.[10]  *Id.*  There is no evidence that Oprock Fee knew about the Oracle upgrade or that it was otherwise involved in the decision to upgrade the software.[11]  *See* ECF No. [324-1] at ¶¶ 10-11.

The upgrade eventually occurred on December 22, 2015 at which time the Jupiter Beach Resort began printing folios with unmasked expiration dates in violation of FACTA.  *See* ECF Nos. [335-2]; [251-2]; [251-8]; [290-6] at 44, 47.  Oracle caused the defect by upgrading and installing the Opera system to version 5.04.02.  *See* ECF No. [130-05] at ¶ 10.  The software issue continued through April 6, 2016.  *Id.*  However, it did not impact seven to ten other point of sale locations within the Jupiter Beach, which remained FACTA compliant.  *See* ECF No. [290-13] at 149.

Following the upgrade, hotel staff reported problems.  On December 22, 2015, an email was sent to Oracle informing it that "the [f]ront [d]esk users can now access the guest folios within Billing, however, apparently they are now receiving the following message when attempting to perform an express checkout/post charges."  ECF No. [290-18].[12]  The error message, which did not pop up prior to the upgrade, references the need to set up a "GST FOLIO

---

[10] GHM disputes this fact within Plaintiff's Statement of Additional Undisputed Facts, but GHM does not direct the Court to anything within the contract demonstrating that the Oracle warranty is broader than Plaintiff represents.  *See* ECF No. [348] at 10-11.

[11] Plaintiff cites to Ade's deposition for the proposition that the Oprock Defendants approved the upgrade prior to its implementation.  *See* ECF No. [335] at 6.  However, the Court's review of the cited testimony is that the "Rockwood asset manager" approved the subject Oracle upgrade at the Jupiter Beach Resort.  *See* ECF No. [290-4] at 24, 112.  Plaintiff does not direct the Court to any testimony that would define "Rockwood asset manager."

[12] Plaintiff incorrectly cited the docket entry pertaining to this email string.  Although GHM argues that this email string is not in the record and cannot be considered, *see* ECF No. [348] at 8, the email is indeed in the record located at ECF No. [290-18].  Consistent with Plaintiff's description, this email dated December 22, 2015 discusses an issue about printing problems after the upgrade and the screenshot reveals a credit card expiration date.  *Id.*  In fact, Lazenby acknowledged at his deposition that there is enough information on the screenshot to understand that the expiration date is exposed.  Moreover, he admits he was copied on the email.  *See* ECF No. [290-8] at 152-153.

printer task." *Id.* Within this series of emails is a screenshot revealing a truncated credit card number with an exposed credit card expiration date. *Id.*

During the December 22, 2015 to April 6, 2016 time period, management estimated that twenty percent of guests who stayed at the Jupiter Beach Resort would have requested a final folio at the front desk. *See* ECF No. [298-5] at 23.[13] According to Defendants' expert Laykin, "this amounts to approximately 1,083 folios that potentially could have been printed with an unmasked expiration date." *Id.* In addition, there were more than 200 pages of folios generated at the Jupiter Beach Resort during this timeframe that revealed credit card expiration dates and were placed into the audit packs that were later reviewed by the hotel's general manager. *See* ECF No. [251-8]; ECF No. [290-6] at 127-129. GHM's general managers and hotel desk staff at the Jupiter Beach Resort were trained to make sure the folios did not show unmasked credit card expiration dates and were FACTA compliant. *See* ECF No. [290-6] at 131-133; ECF No. [290-10] at 133-135. According to GHM's corporate representative, the unmasked expiration date would not have been "obvious," but it can be easily identified "if you are looking for it" because it is the same size as all other print on the folio. *See* ECF No. [290-4] at 70-72, 131.

Once GHM learned about the defective software upgrade and the unmasking of expiration dates, it immediately contacted PCFSI to cure the defect and it was resolved within 24 hours of GHM receiving a copy of the lawsuit and approximately 72 hours after OPL was served. *See* ECF No. [193] at ¶ 67; ECF No. [130-05] at ¶ 11. The Oprock Defendants did not have any involvement in implementing a fix to the Oracle upgrade. *See* ECF No. [324-1] at ¶ 13.

---

[13] Here, Plaintiff relied upon and quoted from Laykin's report in his Statement of Undisputed Facts. Laykin is Defendants' expert witness; therefore, Plaintiff, as the party proffering the evidence on summary judgment, has waived any argument that this portion of Laykin's report is inadmissible hearsay. In any event, Laykin's report can be considered on summary judgment.

They learned about the issue involving the exposed credit card expiration dates after it was already corrected. *Id.*

OPL claims it did not have any involvement in the resolution of the software defect, stating that PCFSI resolved the issue. However, this fact is hotly disputed. OPL claims that Lazenby and Dan Rich ("Rich"), who were tasked with fixing the issue, were employees of PCFSI assisting its client, GHM.[14] *See* ECF No. [326] at 10-11. On the other hand, Plaintiff presented evidence suggesting that Lazenby had some sort of relationship to OPL as his signature line in multiple emails identifies him as the "IT Director" of OPL. *See* ECF No. [290-16]. Further, Lazenby identified himself professionally in other fora as the "IT Director" for OPL, such as in his Linked In profile, the Harvard alumni directory, and an interview with the Portsmouth Herald. *See* ECF No. [290-8] at 41-42, 46-48, 60. OPL's corporate representative admitted that Lazenby identified himself as its "IT Director" and stated that OPL was "probably lax" about this because "people latch onto the name Ocean Properties" and PCFSI uses OPL's name "to gain immediate name recognition to whomever [they] are dealing with." *See* ECF No. [290-6] at 87-88, 96. Similarly, Rich, who handled information technology matters at the Jupiter Beach Resort, also held himself out as the "IT Director" of OPL. *See* ECF No. [290-9] at 16-17, 20, 110-111 (stating that he identified himself as the "IT Director" of OPL in his email signature line and business cards). Others working in information technology for the hotel, such as Gregory Dunham and Greg O'Keefe, likewise represented that they worked for OPL. *See* ECF No. [290-18] (December 22, 2015 emails identifying Greg O'Keefe as the Regional IT Manager for OPL, with an OPL mailing address and email address); ECF No. [290-16] (April 6, 2016

---

[14] PCFSI was not registered to do business in Florida during the time the Oracle software upgrade was unmasking expiration dates. *See* ECF No. [290-6] at 98-99. PCFSI did not register to do business in Florida until months later in October of 2016. *Id.*

emails identifying Gregory Dunham as the regional controller with an OPL signature line and email address).

### H. Plaintiff's Stay at the Jupiter Beach Resort

Plaintiff stayed at the Jupiter Beach Resort from March 8 to March 9, 2017. *See* ECF No. [335-1]. During his stay, he paid with his credit card and received a folio at the front desk of the hotel that unmasked his credit card's expiration date. *Id.* The folio also contained other identifying information, such as his name and residential zip code. *See* ECF No. [47-29].

Prior to the filing of this lawsuit, Plaintiff had never heard of the Oprock Defendants. *See* ECF No. [166-1] at 67-68. He did not visit the hotel in reliance upon who managed it and did not believe that the individuals who worked at the front desk were agents of the Oprock Defendants. *Id.* at 66, 75. As of the date of his deposition, Plaintiff did not know who the Oprock Defendants were. *Id.* at 63-65, and 69.

In the pending Motions, Plaintiff seeks to exclude the expert witness testimony of Defendants' expert witness, Eric Laykin ("Laykin"), while Defendants likewise seek to exclude the testimony of Plaintiff's expert, Don Coker ("Coker"). In addition, all four Defendants seek summary judgment,[15] raising both overlapping and individualized issues. Because the parties' summary judgment briefing, in part, relies upon expert witness testimony, the Court will first address the two *Daubert* Motions to determine which expert witness opinions are admissible. Thereafter, the Court will undertake its review of the three pending Motions for Summary Judgment.

## II. LEGAL STANDARD

### A. Expert Testimony

---

[15] The Oprock Defendants filed a combined Motion for Summary Judgment.

Federal Rule of Evidence 702 governs the admissibility of expert testimony. When a party proffers the testimony of an expert under Rule 702, the party offering the expert testimony bears the burden of laying the proper foundation, and that party must demonstrate admissibility by a preponderance of the evidence. *See Rink v. Cheminova, Inc.*, 400 F.3d 1286, 1291-92 (11th Cir. 2005); *Allison v. McGhan Med. Corp.*, 184 F.3d 1300, 1306 (11th Cir. 1999). To determine whether expert testimony or any report prepared by an expert may be admitted, the Court engages in a three-part inquiry, which includes whether: (1) the expert is qualified to testify competently regarding the matters he intends to address; (2) the methodology by which the expert reaches his conclusions is sufficiently reliable; and (3) the testimony assists the trier of fact, through the application of scientific, technical, or specialized expertise, to understand the evidence or to determine a fact in issue. *See City of Tuscaloosa v. Harcros Chems., Inc.*, 158 F.3d 548, 562 (11th Cir. 1998) (citing *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 590 (1993)). The Eleventh Circuit refers to each of these requirements as the "qualifications," "reliability," and "helpfulness" prongs. *United States v. Frazier*, 387 F.3d 1244, 1260 (11th Cir. 2004). While some overlap exists among these requirements, the Court must individually analyze each concept. *See id.*

An expert in this Circuit may be qualified "by knowledge, skill, experience, training, or education." *J.G. v. Carnival Corp.*, No. 12–21089–CIV, 2013 WL 752697, at *3 (S.D. Fla. Feb. 27, 2013) (citing *Furmanite Am., Inc. v. T.D. Williamson*, 506 F. Supp. 2d 1126, 1129 (M.D. Fla. 2007); Fed. R. Evid. 702. "An expert is not necessarily unqualified simply because [his] experience does not precisely match the matter at hand." *Id*. (citing *Maiz v. Virani*, 253 F.3d 641, 665 (11th Cir. 2001)). "[S]o long as the expert is minimally qualified, objections to the level of the expert's expertise go to credibility and weight, not admissibility." *See Clena*

*Investments, Inc. v. XL Specialty Ins. Co.*, 280 F.R.D. 653, 661 (S.D. Fla. 2012) (citing *Kilpatrick v. Breg, Inc.*, No. 08–10052–CIV, 2009 WL 2058384 (S.D. Fla. June 25, 2009)). "After the district court undertakes a review of all of the relevant issues and of an expert's qualifications, the determination regarding qualification to testify rests within the district court's discretion." *J.G.*, 2013 WL 752697, at *3 (citing *Berdeaux v. Gamble Alden Life Ins. Co.*, 528 F.2d 987, 990 (5th Cir. 1976)).

When determining whether an expert's testimony is reliable, "the trial judge must assess whether the reasoning or methodology underlying the testimony is scientifically valid and whether that reasoning or methodology properly can be applied to the facts in issue." *Frazier*, 387 F.3d at 1261-62 (internal formatting, quotation, and citation omitted). To make this determination, the district court examines: "(1) whether the expert's theory can be and has been tested; (2) whether the theory has been subjected to peer review and publication; (3) the known or potential rate of error of the particular scientific technique; and (4) whether the technique is generally accepted in the scientific community." *Id.* (citing *Quiet Tech. DC-8, Inc. v. Hurel-Dubois, UK Ltd.*, 326 F.3d 1333, 1341 (11th Cir. 2003)). "The same criteria that are used to assess the reliability of a scientific opinion may be used to evaluate the reliability of non-scientific, experience-based testimony." *Id.* at 1262 (citing *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 152 (1999)). Thus, the aforementioned factors are non-exhaustive, and the Eleventh Circuit has emphasized that alternative questions may be more probative in the context of determining reliability. *See id.* Consequently, trial judges are afforded "considerable leeway" in ascertaining whether a particular expert's testimony is reliable. *Id.* at 1258 (citing *Kumho*, 526 U.S. at 152)).

The final element, helpfulness, turns on whether the proffered testimony "concern[s] matters that are beyond the understanding of the average lay person." *Edwards v. Shanley*, 580 F. App'x 816, 823 (11th Cir. 2014) (quoting *Frazier*, 387 F.3d at 1262) (formatting omitted). "[A] trial court may exclude expert testimony that is 'imprecise and unspecific,' or whose factual basis is not adequately explained." *Id.* (quoting *Cook ex rel. Estate of Tessier v. Sheriff of Monroe Cnty., Fla.*, 402 F.3d 1092, 1111 (11th Cir. 2005)). To be appropriate, a "fit" must exist between the offered opinion and the facts of the case. *McDowell v. Brown*, 392 F.3d 1283, 1299 (11th Cir. 2004) (citing *Daubert*, 509 U.S. at 591). "For example, there is no fit where a large analytical leap must be made between the facts and the opinion." *Id.* (citing *General Electric Co. v. Joiner*, 522 U.S. 136 (1997)).

Under *Daubert*, a district court must take on the role of gatekeeper, but this role "is not intended to supplant the adversary system or the role of the jury." *Quiet Tech.*, 326 F.3d at 1341 (internal quotations and citations omitted). Through this function, the district court must "ensure that speculative, unreliable expert testimony does not reach the jury." *McCorvey v. Baxter Healthcare Corp.*, 298 F.3d 1253, 1256 (11th Cir. 2002). "[I]t is not the role of the district court to make ultimate conclusions as to the persuasiveness of the proffered evidence." *Quiet Tech.*, 326 F.3d at 1341 (internal quotations and citations omitted). Thus, the district court cannot exclude an expert based on a belief that the expert lacks personal credibility. *Rink*, 400 F.3d at 1293, n.7. To the contrary, "vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." *Quiet Tech.*, 326 F.3d at 1341 (quoting *Daubert*, 509 U.S. at 596); *see Vision I Homeowners Ass'n, Inc. v. Aspen Specialty Ins. Co.*, 674 F. Supp. 2d 1321, 1325 (S.D. Fla. 2009) (quoting *Jones v. Otis Elevator Co.*, 861 F.2d 655, 662 (11th Cir. 1988)

("On cross-examination, the opposing counsel is given the opportunity to ferret out the opinion's weaknesses to ensure the jury properly evaluates the testimony's weight and credibility.")).

## B. Summary Judgment

A court may grant a motion for summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The parties may support their positions by citation to the record, including, *inter alia*, depositions, documents, affidavits, or declarations. *See* Fed. R. Civ. P. 56(c). An issue is genuine if "a reasonable trier of fact could return judgment for the non-moving party." *Miccosukee Tribe of Indians of Fla. v. United States*, 516 F. 3d 1235, 1243 (11th Cir. 2008) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986)). A fact is material if it "might affect the outcome of the suit under the governing law." *Id.* (quoting *Anderson*, 477 U.S. at 247-48). The Court views the facts in the light most favorable to the non-moving party and draws all reasonable inferences in the party's favor. *See Davis v. Williams*, 451 F.3d 759, 763 (11th Cir. 2006). "The mere existence of a scintilla of evidence in support of the [non-moving party's] position will be insufficient; there must be evidence on which a jury could reasonably find for the [non-moving party]." *Anderson*, 477 U.S. at 252. The Court does not weigh conflicting evidence. *See Skop v. City of Atlanta, Ga.*, 485 F.3d 1130, 1140 (11th Cir. 2007) (quoting *Carlin Comm'n, Inc. v. S. Bell Tel. & Tel. Co.*, 802 F.2d 1352, 1356 (11th Cir. 1986)).

The moving party shoulders the initial burden to demonstrate the absence of a genuine issue of material fact. *See Shiver v. Chertoff*, 549 F.3d 1342, 1343 (11th Cir. 2008). If a movant satisfies this burden, "the nonmoving party 'must do more than simply show that there is some metaphysical doubt as to the material facts.'" *Ray v. Equifax Info. Servs., L.L.C.*, 327 F. App'x

819, 825 (11th Cir. 2009) (quoting *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986)). Instead, "the non-moving party 'must make a sufficient showing on each essential element of the case for which he has the burden of proof.'" *Id.* (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986)). The non-moving party must produce evidence, going beyond the pleadings, and by its own affidavits, or by depositions, answers to interrogatories, and admissions on file, designating specific facts to suggest that a reasonable jury could find in the non-moving party's favor. *Shiver*, 549 F.3d at 1343.

## III. DISCUSSION

### A. Plaintiff's *Daubert* Motion

Defendants have retained and disclosed Erik Laykin as their expert witness in this case. Following the disclosure of Laykin's report and his deposition, Plaintiff now seeks to exclude the following three opinions: (1) cybercrime techniques are more prevalent than criminal techniques involving paper receipts, (2) certain receipts at the Jupiter Beach Resort were masked, and (3) Defendants did not act willfully. The Court addresses each opinion to determine its admissibility on summary judgment and at trial.

#### 1. *Prevalence of Cybercrime In Relation to Crime Involving Paper Receipts*

Plaintiff first seeks to exclude Laykin's opinion about the prevalence of cybercrime activity in today's world, arguing that such an opinion is not relevant as this case involves a paper receipt – not cybercriminal activity. *See* ECF No. [298] at 1. As such, Plaintiff argues that Laykin's opinion is not helpful to the trier of fact in understanding the evidence or determining an issue. *Id.* at 3. Thus, Plaintiff challenges the "helpfulness" of Laykin's cybercrime opinion. His report devotes a significant amount of time to discussing current techniques used in the cybercrime world to illegally obtain credit card numbers and to commit identity theft, such as the

internet black market, "key logging," the "man-in-the-middle" attacks, massive data breaches, *etc. See* ECF No. 298-5 at 32-46. The purpose of this analysis, as explained in Laykin's report, is "to submit that even if a guest folio showing an expiration date and last four digits was lost, the risk of harm to the guest would not be significantly increased and the guest would not plausibly face an imminent risk of being harmed." *Id.* at 32. Ultimately, Laykin concludes that Plaintiff has not suffered any harm as a result of the printing of the expiration date on the folio. *Id.*

In response, Defendants argue that Laykin's opinion is relevant to the issue of standing under Article III. *See* ECF No. [309] at 5 n. 10; 10 n. 20. More specifically, they state: "[t]he threshold issue for Article III standing in a FACTA case such as this is not whether 'any' risk of harm exists, but whether Plaintiff can demonstrate a '*material* risk of harm to the underlying interest' of identity theft protection. . . . Laykin opines that the risks Plaintiff identifies are 'infinitesimally small' which of course would not subject a cardholder to a 'material' risk of harm." *Id.* at 5, n. 10 (emphasis in original, internal citations omitted). Plaintiff's Article III standing, however, has already been decided by this Court as a matter of law. The Court is cognizant that the briefing period on the *Daubert* Motions overlapped the briefing on Plaintiff's Motion for Class Certification. For that reason, when the parties prepared their respective *Daubert* memoranda, they did not have the benefit of the Court's Order on Motion for Class Certification ("Order") wherein the issue of standing was decided. *See* ECF No. [330] at 6-11.

In the Order, the Court reasoned that Defendants' analysis "ignore[d] that '[c]ourts[, including this one,] have [] considered a FACTA violation to be concrete *as soon as a company prints the offending receipt*, as opposed to requiring a plaintiff actually suffer identity theft.'" *Id.* at 8-9 (quoting *Guarisma v. Microsoft Corp.*, 209 F. Supp. 3d 1261, 1266 (S.D. Fla. July 26,

2016)). Relying upon *Wood v. Choo USA, Inc.*'s[16] finding that the consumer "suffered a concrete harm *as soon as Jimmy Choo printed the offending receipt*," the Order concluded that "the concrete harm [here] materialized at the very moment the folio was printed regardless of whether Plaintiff immediately noticed the violation and safeguarded it." *See* ECF No. [330] at 9. Since the issuance of this Order, another opinion from the Southern District of Florida, also involving an alleged FACTA violation at a hotel, likewise held that the plaintiff "without question" established a concrete injury for purposes of Article III standing. *See Guarisma v. Hyatt Equities, LLC*, No. 17-cv-20931-UU, ECF No. [50] at 8 (S.D. Fla. Sept. 28, 2017) ("Every court in this District, including this Court, uniformly holds that FACTA creates a substantive right for consumers to have their personal credit card information truncated on receipts and provided to customers at the point of sale.").

In support of Laykin's opinion and their standing argument, Defendants bring to the Court's attention another recent opinion from this district, which reached an opposite conclusion. *See Gesten v. Burger King*, No. 17-cv-22541-RNS, ECF No. [35] (S.D. Fla. Sept. 27, 2017). The analysis in *Burger King* is contrary to this Court's prior analysis on the issue of standing under FACTA as well as the weight of authority within this District. In fact, *Burger King* appears to be the only opinion to date in this District reaching a contrary result on this issue. The Court declines to reconsider its prior ruling that Plaintiff established a concrete injury and, therefore, established this element of Article III standing. Because Plaintiff's standing has been decided as a matter of law and Defendants concede that Laykin's opinions on cybercrime are solely related to the issue of standing, Plaintiff's *Daubert* Motion on this specific point has been rendered moot. Defendants admit that such testimony is solely for the Court and not the jury's

---

[16]  201 F. Supp. 3d 1332, 1340 (S.D. Fla. 2016).

consideration. *See* ECF No. [309] at 10 n. 20 ("*Winn-Dixie* does not limit relevance to issues at trial. The trier of fact here is the Court, which can make factual findings on certain issues (like subject matter jurisdiction) before trial."). As such, this opinion is excluded.

### 2. *The Unmasking of Certain Folios*

Plaintiff next seeks to strike Laykin's opinion that certain folios at the Jupiter Beach Resort masked the expiration dates because this opinion is the *ipse dixit* of the expert and is not helpful to the jury. *See* ECF No. [298] at 6-9. Plaintiff's first argument appears to challenge the reliability of Laykin's methodology while the second argument relates to the helpfulness prong of a *Daubert* analysis. The Court will address each argument in turn.

On the issue of reliability, Plaintiff seeks to exclude Laykin's conclusion that only certain credit and debit card transactions resulted in printed receipts with unmasked expiration dates during the relevant timeframe, arguing the opinion "appear[s] created out of whole cloth or for which the persons Laykin identified as a source testified that they are not familiar with the area on which Laykin claims they were the source for." ECF No. [298] at 6. To analyze Plaintiff's argument, the Court must first identify the factual basis for Laykin's opinion. His report lays out the following pertinent facts in support of this opinion:

- "The FACTA violations alleged in this lawsuit in reference to unmasked expiration dates do not involve any folios delivered under a guest's door, viewed on a television screen, or provided to a guest prior to check out, and do not involve any receipts printed at a point of sale, such as the gift shop."

- "If a guest had requested a final folio after checking out, then during the period from the Oracle Opera upgrade to April 6, 2016, the expiration date is believed to have appeared on some customers' final folios."

- "Most guests of Jupiter Beach resort check out of the hotel without requesting a final folio."

- "Management estimates that twenty percent (20%) of Jupiter Beach Resort guests request a final folio based on the information tracked by Jupiter Beach Resort information technology support staff and its front desk personnel since the commencement of this lawsuit."

- "When applied to the 5,417 credit card transactions that occurred during this period, this amounts to approximately 1,083 folios that potentially could have been printed with an unmasked expiration date."

*See* ECF No. [298-5] at 23.

Challenging the reliability of this opinion, Plaintiff points out that Laykin arrived at this conclusion without observing a single folio during the relevant timeframe that revealed masked expiration dates. *See* ECF No. [298]. Further critiquing the opinion's foundation, Plaintiff argues that Laykin could not identify any individuals he allegedly spoke with as part of his investigation and, with regard to those individuals he identified by name, such as Lazenby and Rich, they did not know any of this information. *Id.*

Before analyzing the basis for Laykin's opinion though, the Court is compelled to point out that Plaintiff relies upon this exact opinion when challenging the Defendants' Motions for Summary Judgment. *See e.g.* ECF No. [335] at 6. Indeed, Plaintiff's "Statement of <u>Undisputed</u> Facts" quotes from this portion of Laykin's report and states: "During that time, Defendants' expert estimated that Jupiter Beach's front desk staff handled and gave to customers 1,083 receipts with unmasked expiration dates." *Id.* (emphasis added). Plaintiff appears to assert

inconsistent positions of disclaiming's Laykin's methodology yet then relying upon it to create an issue of fact.

Regardless of the inconsistency, the Court has reviewed Laykin's report, his testimony, and the testimony of the witnesses upon whom he relies and finds a sufficient evidentiary foundation exists, removing it from realm of impermissible *ipse dixit* opinions. Laykin's report states that he relied upon all materials identified in Exhibit B to his report, which in part lists the following: "Interview of Mr. Cliff Lazenby and Mr. Dan Rich by Erik Laykin, May 25, 2017," "Interview of Mr. Bob Garcia," "Deposition of Justin William Bouton, March 30, 2017" and "Deposition of Richard C. Ade, February 22, 2017." *See* ECF No. [298] at 7, 77-81. In addition, at his deposition, Laykin testified that he interviewed Michael Walsh; a "gentleman who Mr. Rich and Mr. Lazenby reported to at PCFSI" identified by Defendants as Bob Garcia;[17] and an individual who worked at the Jupiter Beach Resort during the relevant timeframe with "management expertise, and firsthand knowledge of the operations at the front desk and operations at the Jupiter Beach Resort."[18] *See* ECF No. [290-10] at 25-26, 28, and 31.

Starting with the February 22, 2017 deposition of Ade, the Court notes that this witness testified in his capacity as the corporate representative of OPL and GHM. *See* ECF No. [298] at 30. In his Reply, Plaintiff argues that Laykin cannot rely on Ade's testimony because he did not have personal knowledge of the specific issues. *See* ECF No. [312] at 5. However, Mr. Ade was not testifying as an individual based on his personal knowledge but was instead testifying on behalf of both corporations on the topics listed in the Notices of Taking Deposition. *See QBE Ins. Corp. v. Jorda Enterprises, Inc.*, 277 F.R.D. 676, 688 (S.D. Fla. 2012) ("The testimony of a Rule 30(b)(6) witness represents the collective knowledge of the corporation, not of the specific

---

[17] This is consistent with Laykin's report, which identifies an interview with Bob Garcia.
[18] The identity of this individual remains unclear based on the record.

individual deponents. . . .The corporation appears vicariously through its designees."). Thus, Ade was not required to have such personal knowledge because he stepped into the shoes of GHM and OPL at that deposition.

At his deposition, Ade testified that an investigation was conducted to determine whether the receipts generated at the Jupiter Beach Resort's gift shop and bar area were being properly masked for expiration dates. *See* ECF No. [298-1] at 63. According to Ade, the investigation found no issue with those receipts generated from food and beverage sales or at the gift shop because it used different software, POS, and the issue was with the PMS software. *Id.* Ade further testified that, "[a]t check-out in most cases [the folio] is slid under the door" and "[m]ost people walk off the property" while "very few people go to the front desk and say, can you print a folio?" *Id.* at 47. Rich testified at his deposition that, after April of 2016, his supervisor Bob Garcia ("Garcia") began tracking data to determine how many guests stop at the front desk to obtain a printed folio upon check out. *See* ECF No. [298-10] at 92-93. Although Garcia's deposition, if it was taken, does not appear to be in the record, Laykin's report indicates that he spoke with Garcia as part of his investigation. *See* ECF No. [298] at 7, 77-81. Rich also confirmed that when he spoke with Laykin, Garcia was on the telephone call. *See* ECF No. [298-10] at 86. Thus, Laykin spoke with the individual who tracked the data regarding the number of folios printed at the front desk. Additionally, Laykin spoke with Michael Walsh who testified that approximately 75 to 80 percent of the receipts generated at the Jupiter Beach Resort are from the bar, restaurant, spa, gift shop, pool bar and banquet area. *See* ECF No. [298-11] at 148. Laykin's opinion relies upon this evidence and Laykin either spoke with these witnesses or reviewed their deposition in connection with his report. This is not a situation where an expert's conclusions are only connected to existing data solely by the *ipse dixit* of the expert. *See Guinn*

*v. AstraZeneca Pharm. LP*, 602 F.3d 1245, 1255–56 (11th Cir. 2010) (finding that expert witness' testimony was unreliable because the "conclusions were not logically supported by the facts of th[e] case). To the contrary, Laykin's opinion is supported by the evidence made available to him.

The Court recognizes that Laykin's report cites to interviews with Lazenby and Rich to support the estimated number of printed folios at the front desk during the relevant time period and that both of these witnesses disclaimed knowledge of such information at their deposition.[19] *See* ECF No. [298] at 6. On the other hand, the case materials that Laykin identified in his report and deposition demonstrate that he interviewed four witnesses and reviewed two deposition transcripts, all of which provide him the foundation for the opinion Plaintiff seeks to strike. To the extent Laykin's report incorrectly states that he relied upon Lazenby and Rich for such information, Plaintiff may explore those issues on cross-examination. However, the Court will not strike Laykin's opinion on these grounds when he had an adequate foundation.

Plaintiff also argues that Laykin cannot be used as a conduit for inadmissible hearsay testimony.[20] *See* ECF No. [312] at 6, n. 7. However, "[t]he Federal Rules of Evidence specifically allow an expert to engage in hearsay testimony based on the type of evidence

---

[19] Plaintiff's *Daubert* Motion also suggests that Lazenby and Rich did not recall having a discussion with Laykin. *See* ECF No. [298] at 6 ("[B]oth Lazenby and Rich testified that they don't recall that discussion. . ."). Rich and Lazenby testified that they recalled speaking with Laykin but did not recall the details of the conversation. *See* ECF No. [298-9] at 260 ("I don't recall most of the content of the conversation to be honest with you, so no, I don't recall that."); ECF No. [298-10] at 87 ("I can't remember what we talked about.").

[20] Plaintiff's Reply also argues that Laykin's inability to "observe what happened retroactively" is a basis to exclude his testimony. Experts need not have personal knowledge or be an eye witness to testify. *Banta Properties, Inc. v. Arch Specialty Ins. Co.*, No. 10-61485-CIV, 2011 WL 13096476, at *3 (S.D. Fla. Dec. 22, 2011). Seldom would be the case that an expert witness could observe the facts of a case retroactively, absent some video or other contemporaneous recording of the occurrence. *Id.* (rejecting *Daubert* challenge to expert's lack of personal knowledge of property damage caused by Hurricane Wilma, even though the expert did not inspect the property until years later, because he relied upon reports from other contractors, photographs, and witness interviews).

reasonably relied on by those in his or her field." *See Kirksey v. Schindler Elevator Corp.*, No. CV 15-0115-WS-N, 2016 WL 3189242, at *5 (S.D. Ala. June 7, 2016), *reconsideration denied*, No. CV 15-0115-WS-N, 2016 WL 6462176 (S.D. Ala. Oct. 28, 2016) (citing *United States v. Floyd*, 281 F.3d 1346, 1349 (11th Cir. 2002)); *United States v. Steed*, 548 F.3d 961, 975–76 (11th Cir. 2008) ("[E]ven assuming that the bases of Gonzalez's expertise as a law enforcement agent constituted inadmissible hearsay, his testimony in this regard did not violate Rule 703 because those sources are reasonably relied upon by experts in the field."); Fed. R. Evid. 703 ("An expert may base an opinion on facts or data in the case that the expert has been made aware of or personally observed. If experts in the particular field would reasonably rely on those kinds of facts or data in forming an opinion on the subject, they need not be admissible for the opinion to be admitted."). Plaintiff does not argue that experts in Laykin's field do not rely upon witness interviews. Instead, Plaintiff argues that "Laykin cannot proffer testimony resting on hearsay statements." Such an argument ignores that Rule 703 allows experts to rely on hearsay and creates a procedure through which experts can testify to the contents of the documents upon which their opinions are based. *See Kirksey*, 2016 WL 3189242 at * 5 (citing *United States v. An Easement and Right-of-way Over 6.09 Acres of Land*, 2015 WL 6444983, *22 (N.D. Ala. Oct. 21, 2015)).

Finally, Plaintiff challenges the helpfulness of this opinion. The Court finds that Laykin's opinion will assist the jury in deciding the issue of willfulness, which is a threshold issue that Plaintiff must prove at trial to be awarded any damages. Defendant's theory of the case is that the number and frequency of guests who received a printed folio with an unmasked expiration date was so small that management could not have noticed the issue and, therefore, they could not have knowingly or recklessly violated FACTA. *See* ECF No. [309] at 12.

Laykin's opinion will assist the jury in understanding issues of knowledge, which ties directly into the issue of willfulness, thereby satisfying the helpfulness prong. However, while Laykin can provide his opinion in support of Defendants' knowledge defense, Laykin may not testify to legal conclusions involving Defendants' willfulness or recklessness as explained below.

### 3. Defendants' Willfulness

Lastly, Plaintiff seeks to strike a series of "wholly uninformed" legal conclusions in Laykin's report relating to the lack of a "willful" violation under FACTA. *See* ECF No. [298] at 9-10. In his report, Laykin devoted multiple pages to the issue of "Lack of Willfulness and Recklessness." *See* ECF No. 298-5 at 29-31. In doing so, Laykin states that Plaintiff "can[not] demonstrate that Defendants' actions with respect to printed folios were a willful, knowing, reckless or intentional violation of FACTA." *See* ECF No. 298-5 at 29. The report repeatedly references the lack of "willful" conduct and the lack of "recklessness," ultimately opining that "[t]hese actions taken by Jupiter Beach Resort over a period of years demonstrate a lack of willfulness and recklessness in this matter despite the reality that there was a failure to catch this computer glitch earlier." *Id.* at 29-31.

For a plaintiff to recover damages in a FACTA lawsuit that does not allege actual harm, as is the case here, the plaintiff must demonstrate the defendant "willfully failed to comply" with FACTA's requirements. *See* 28 U.S.C. § 1681n(a). The term "willfully" in § 1681n(a) has been construed as requiring evidence of a knowing or reckless disregard for the law. *Harris v. Mexican Specialty Foods, Inc.*, 564 F.3d 1301, 1310 (11th Cir. 2009). To prove recklessness, a plaintiff must establish that the Defendants' "action[s] are not only a violation under a reasonable reading of the statute's terms,' but also "that the company ran a risk of violating the law substantially greater than the risk associated with a reading [of the law] that was merely

careless." *Safeco Ins. Co. of Am. v. Burr*, 551 U.S. 47, 55-57 (2007)).  At trial, the jury will be asked to determine whether Defendants' alleged violation of FACTA was "willful" (i.e. knowing or reckless).  By opining that Defendants did not act willfully or recklessly, Laykin would be telling the jury the specific result it should reach, which is impermissible.  *Montgomery v. Aetna Cas. & Sur. Co.*, 898 F.2d 1537, 1541 (11th Cir. 1990) ("An expert may not, however, merely tell the jury what result to reach.").  Expert witness testimony that suggests the ultimate result to the jury is not helpful.  *Id.*  Further, "[a] witness also may not testify to the legal implications of conduct; the court must be the jury's only source of law." *Id.* (citing *United States v. Poschwatta,* 829 F.2d 1477, 1483 (9th Cir. 1987); *United States v. Baskes,* 649 F.2d 471, 479 (7th Cir. 1980)).

In their Response, Defendants do not dispute that Laykin's opinions regarding willfulness and recklessness are legal conclusions.[21]  Instead, Defendants refocus the *Daubert* issue by arguing that Laykin's opinion that "Jupiter Beach Resort responded immediately, responsibly, and effectively to rectify the software glitch caused by Oracle's software upgrade" is not a legal conclusion.  ECF No. [309] at 17.  While the latter may be true, that is not the opinion Plaintiff seeks to strike.   Rather, Plaintiff is clearly seeking to strike Laykin's "unabashed legal conclusions on whether Defendants were willful or reckless in unmasking expiration dates on thousands of receipts over a 3 ½ month period."  ECF No. [298] at 9.  The Court agrees with Plaintiff that Laykin may not testify about the legal implications of Defendants' conduct as such testimony invades the province of the Court and is not helpful to the jury.  This exclusion includes any opinion that Defendants did not act in a willful or reckless manner, and to this extent, Plaintiff's *Daubert* Motion is granted.

---

[21] Defendants do not dispute that legal conclusions are inadmissible.  In fact, Defendants' own *Daubert* Motion contains a section entitled "LEGAL CONCLUSIONS INVADE THE PROVINCE OF THE JURY" in which Defendants argue that "Mr. Coker cannot opine that Defendants violated FACTA because such an opinion would be a conclusion of law."  ECF No. [300] at 18.

### B. Defendants' *Daubert* Motion

Defendants' *Daubert* Motion challenges the opinions of Plaintiff's expert, Don Coker, and seeks to preclude him from testifying on three specific subjects: (1) whether exposing a hotel customer's credit card expiration date on a folio subjects the customer to a risk of harm under FACTA, (2) whether the proposed class is ascertainable, and (3) whether the unmasking of expiration dates at the Jupiter Beach Resort occurred recklessly and due to a "gross deviation from industry standard practices." *See* ECF No. [300] at 2.

#### 1. *Risk of Harm*

Much like Defendant, Plaintiff disclosed an expert who discusses the risk of harm of exposing a credit card expiration date on a printed receipt but, predictably, Coker's analysis reaches the opposite conclusion. As the parties concede in their memoranda, this opinion is relevant to the issue of Plaintiff's Article III standing. In their Motion, Defendants seeks to exclude the opinion under all three prongs of a *Daubert* inquiry – qualifications, reliability, and helpfulness. However, the Court need not decide these matters. The Court's finding at the class certification stage that Plaintiff suffered a concrete harm rendered the issue of standing moot. The Court arrived at this conclusion as a matter of law without reliance upon the expert witness reports.[22]

Nonetheless, Plaintiff's Response argues that Coker's opinion will be helpful *to the jury*. *See* ECF No. [307] at 13. In support of this argument, Plaintiff states that exclusion of Coker's opinion would prejudice Plaintiff and unfairly benefit Defendants because Laykin provides a contrary opinion. *Id.* This argument fails to recognize that standing is a question of subject matter jurisdiction, not a question for the trier of fact. The jury will not be asked to decide the

---

[22] The Court recognizes the parties did not have the benefit of this ruling at the time they briefed the *Daubert* issues.

issue of Plaintiff's standing, thereby eliminating the need for Laykin or Coker to testify about this subject.  At trial, the jury will be asked to determine whether Defendants violated FACTA, specifically whether they accepted credit cards or debit cards for the transaction of business and printed more than the last five digits of the card number or the expiration date upon the receipt provided to Plaintiff at the point of sale or transaction.  *See* 15 U.S.C. § 1681(c)(g).  If the jury answers this question in the affirmative, it will then be asked to decide whether Defendants willfully failed to comply with this requirement and if so, to assess damages.  *See* 15 U.S.C. § 1681n.  However, the jury will not be asked whether Plaintiff suffered any harm or risk of harm; therefore, such an opinion would not help the jury decide the issues at trial.  *See McDowell v. Brown*, 392 F.3d 1283, 1299 (11th Cir. 2004) (citing *Daubert*, 509 U.S. at 591) (stating that for an opinion to be helpful, a "fit" must exist between the offered opinion and the facts of the case).  Much like the Court found that Laykin's opinion on this point is moot, the Court likewise finds that Coker's competing opinion on the same subject is moot.  As such, this opinion is excluded.

### 2.  *Ascertainability*

Defendants next seek to exclude Coker's opinion on another class-certification subject that is moot in light of the Court's Order.  Specifically, Defendants seek to preclude Coker from opining that the class is ascertainable.  *See* ECF No. [300] at 8.  Once again, the Court need not decide whether Coker is qualified to render this opinion, whether his methodology was reliable or whether this opinion is helpful.  The Court already determined that the members of the proposed class and subclass are not ascertainable in that certification of the class would require individualized inquiries to determine whether each individual "received any receipts or folios during their stay at the Jupiter Beach Resort, and if so, whether the receipt or folio was obtained from the front desk."  ECF No. [330] at 19.  The Court reached this conclusion based on the

factual evidence in the record without any reliance upon expert witness reports. *Id.* at 20 n. 8. Thus, any expert opinions on the subject of ascertainability of the class are moot in light of the Court's prior order denying class certification. As such, this opinion is excluded.

### 3. Hotel Industry Practices

The third opinion Defendants seek to exclude is Coker's conclusion that unmasking of expiration dates occurred recklessly due to a "gross deviation from industry standard practices." Defendants challenge Coker's qualifications, the reliability of his methodology, and the helpfulness of the opinion. For the reasons explained below, the Court finds that Coker is not qualified to provide opinions on hotel industry practices and that the methodology he used to reach those opinions lacks a factual foundation, rendering the opinion unreliable.

Starting with the qualifications prong, Defendants argue that Coker cannot comment upon the industry practices at the Jupiter Beach Resort and Defendants' compliance or lack of compliance with such practices when he has no hotel employment experience, no hospitality education, no knowledge of the hotel industry, no understanding of the hotel check-out process, no understanding of the Opera software used at the hotel, no knowledge about Oracle's relationship to the hotel, and no history of publications on the subject. *See* ECF No. [300] at 16. Rather than address Coker's qualifications to provide this specific opinion, Plaintiff argues that (1) Coker need not have experience in cybersecurity or the prevalent forms of identity theft, (2) Coker has years of professional experience as a high-level banker, mortgage banker, lender, and independent consultant, (3) Coker has been published in these fields, and (4) Coker has testified extensively as an expert witness, including serving as an expert in more than 50 FACTA cases. *See* ECF No. [307] at 2-6.

While the Court agrees that Coker has significant experience, training, and education in areas of finance, lending, and banking, Coker's opinion extends far beyond the scope of his expertise. By testifying about Jupiter Beach Resort's gross deviation from "industry practices," he necessarily implicates the standard practices of the hospitality industry. In order to opine on Defendants' hotel practices, it is necessary that Coker have at least some minimal training, education, experience, knowledge, or skill in this particular industry. *See J.G.*, 2013 WL 752697 at *3 (citing *Furmanite*, 506 F. Supp. 2d at 1129; Fed. R. Evid. 702. Although "[a]n expert is not necessarily unqualified simply because [his] experience does not precisely match the matter at hand," Coker's background has no relationship or connection to the very industry about which he seeks to opine. *Id.* (citing *Maiz v. Virani*, 253 F.3d 641, 665 (11th Cir. 2001)). Not only is it undisputed that he has no such background, but Coker admits he has not previously been an expert in a case involving a hotel. *See* ECF No. [300-2] at 9 ("[A]lthough this case may be the first involving a hotel company, the FACTA violation is substantially the same as those that I have previously been involved in."). While Coker's report is arguably unclear on which "industry practices" he is opining on, Plaintiff's Response does not dispute that this opinion pertains to the hotel industry. Instead, the focus of Plaintiff's Response is on Coker's banking credentials and his extensive experience as an expert in other FACTA cases. *See* ECF No. [307] at 2-8. Coker's report, rebuttal report, and curriculum vitae reflects the complete absence of any background that would qualify him as an expert on hotel industry practices.

Even if the Court interpreted Coker's report to opine upon "industry practices" within the credit card industry, Coker's opinion is still subject to exclusion given the unreliability of Coker's methodology. When determining whether an expert's testimony is reliable, "the trial judge must assess whether the reasoning or methodology underlying the testimony is

scientifically valid and whether that reasoning or methodology properly can be applied to the facts in issue." *Frazier*, 387 F.3d at 1261-62 (internal formatting, quotation, and citation omitted). The Court's review of Coker's report reveals that he prepared a 25-page report outlining his opinions having reviewed only three documents specific to this case: (1) the Class Action Complaint, (2) Defendant's Responses to First Set of Discovery Requests, and (3) a receipt dated June 3, 2016. *See* ECF No. [300-1] at 6, 25 (stating that he reviewed "the subject receipt" and "the case materials listed in the 'Materials Reviewed' section of th[e] Report."). Based on the description of materials, it appears that Coker did not even review the operative complaint in this case or the subject receipt. The original complaint filed against OPL on April 1, 2016 was entitled "*Class Action Complaint* for Violations of the Fair and Accurate Credit Transactions Act (FACTA)" while the current complaint against all Defendants is entitled "*Plaintiff's Second Amended* Class Action Complaint for Violations of the Fair Accurate Credit Transactions Act (FACTA)." *Compare* ECF No. [1] (emphasis added) *with* [47] (emphasis added). As to the folio or receipt, the subject folio was dated March 9, 2016, but Coker states that the receipt he reviewed was dated June 3, 2016. *Compare* ECF No. [47-29] *with* [300-1] at 25. *Id.* Therefore, it is doubtful that Coker reviewed Plaintiff's receipt from the Jupiter Beach Resort and even more doubtful that he reviewed a receipt that unmasked the expiration date as it is undisputed that the Oracle software issue was corrected by April 6, 2016 – two months before the date on the folio Coker reviewed.[23]

---

[23] Coker also states he reviewed "Defendant's Responses to First Set of Discovery Requests." *See* ECF No. [300-1] at 25. Although it is unclear which Defendant's discovery responses he reviewed and whether those responses pertained to a request for production, request for admissions, or interrogatories, it is clear that he only reviewed discovery responses pertaining to one of the four Defendants in this case. Despite this, he provided opinions pertaining to all four Defendants.

Moreover, even if Coker had the operative pleading and the subject receipt, Coker reaches conclusions regarding Defendants' alleged failure to adhere to industry practices without reviewing any testimony or otherwise conducting any investigation into the practices or software used at the Jupiter Beach Resort. Specifically, Coker's report concludes as follows:

> The Defendants clearly were at fault for not obtaining and maintaining systems that would comply with FACTA's requirements that were passed into law by Congress in 2003 and went into effect in 2006. The Defendants could have adjusted its [sic] IT systems to comply with FACTA, hired an outside firm to do the task or purchase a module or new system that would achieve compliance with FACTA, but *they did not*.

*See* ECF No. [300-1] at 23-24 (emphasis added).

Rather than address how Coker arrived at his opinions in his original report, Plaintiff's Response focuses almost exclusively on the evidence he considered in support of his rebuttal report issued six months later in direct response to Laykin's report.[24] Yet, Defendants' *Daubert* Motion seeks to strike only those opinions within Coker's original report, s*ee* ECF No. [300] at 16-18, and Coker cannot rely upon evidence he reviewed six months after he issued his original report to support those earlier opinions. Focusing the Court's analysis on Coker's original report, Plaintiff's states he based his opinion that Defendants failed to adhere to industry standards on: (1) Defendants' receipt of notices discussing the requirements of FACTA sent by Visa and Mastercard to all merchants, (2) OPL's status as a defendant in a 2008 lawsuit alleging a FACTA violation, and (3) Coker's "experience and observations [that] 'a business in the same position as Defendants would choose to take the legally required actions to bring its IT system

---

[24] For example, Plaintiff argues that "Coker read several transcripts including Defendants' corporate representative Richard Ade, and Mr. Lazenby's, as his reports indicate." *See* ECF No. [307] at 19. However, Coker's original report does not cite to a single deposition transcript among the materials reviewed. *See* ECF No. [300-1] at 25. It was not until the rebuttal report issued six months later that Coker listed any deposition transcripts. *See* ECF No. 300-2 at 9. It would have been *impossible* for Coker to rely upon either deposition transcript when he issued his January 30, 2017 report as Ade's deposition was taken on February 22, 2017 and Lazenby's deposition was taken on May 11, 2017. *Compare* ECF No. [300-1] at 1 *with* [300-2] at 9.

into compliance with FACTA." *See* ECF No. [300-1] at 16; ECF No. [307] at 15-16. Plaintiff's Response does not direct the Court to any other basis for the opinions in Coker's *original* report. Significantly, Coker's report does not cite to any documents, testimony or other evidence he relied upon when determining that all four Defendants failed to adjust their IT systems to comply with FACTA, that all four Defendants failed to hire an outside company to assist them with FACTA compliance, or that none of the Defendants purchased a module or new system to achieve such compliance. *Id.*

Thus, the Court finds that Coker's conclusions are unreliable in that they are not logically supported by any facts. *See Guinn*, 602 F.3d at 1255–56 (affirming district court's decision to exclude testimony as unreliable when the "conclusions were not logically supported by the facts of th[e] case). Neither *Daubert* nor the Federal Rules of Evidence require this Court to "admit opinion evidence which is connected to existing data only by [Coker's] *ipse dixit*." *Id.* (quoting *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997)). This Court finds that "there is simply too great an analytical gap between the data [Coker relied upon] and the opinion proffered." *Id.*; *see also McDowell*, 392 F.3d at 1301–02 ("[A]n expert opinion is inadmissible when the only connection between the conclusion and the existing data is the expert's own assertions...."). Coker's methodology is simply unreliable. As such, his opinions in this area are inadmissible.

### 4. Legal Conclusions

Finally, Defendants seek to preclude Coker from opining that they violated FACTA, arguing this is an impermissible legal conclusion. *See* ECF No. [300] at 18. Coker's report states that Defendants' "widespread violation of FACTA was not an accident but rather was simply a failure or refusal to act when it should have." ECF No. [300-1] at 16. It also references instances of Defendants' "reckless" conduct. *Id.* Consistent with this Court's ruling that Laykin

may not opine in the form of legal conclusions at trial, *see* Section III(A)(3), Coker likewise may not testify that Defendants violated FACTA or that they acted willfully or recklessly as those legal conclusions invade the province of the Court and are not helpful to the jury.

### 5. Coker's Testimonial List

Lastly, Defendants seek to strike Coker as an expert because the testimonial lists attached to his original report and rebuttal report do not provide any case numbers, jurisdictions, citations or otherwise specify whether the testimony was at trial or in the form of deposition.[25] Defendants argue that the failure to provide such information is "*per se* 'prejudicial to Defendants.'" ECF No. [300] at 4 (citing *Medina v. United Christian Evangelistic Ass'n*, 2009 WL 4030454 (S.D. Fla. Nov. 20, 2009)). While it is true that Coker's testimonial lists are devoid of this information, the Court notes that Coker's original report was dated January 30, 2017 and, according to Plaintiff, it was delivered to Defendants on February 1, 2017. *See* ECF No. [307] at 19. Yet, Defendants did not raise this issue until their *Daubert* Motion was filed on July 31, 2017 – six months later. At no point in time did Defendants move to compel the information in an effort to cure any prejudice. Similarly, Defendants received Coker's rebuttal report on June 12, 2017 and then waited six weeks to raise this issue. Defendants cannot claim that this omission has unfairly prejudiced them and seek to strike Coker when they failed to apprise the Court of the omission or to otherwise cure the potential prejudice. *See Jones v. Royal Caribbean Cruises, Ltd.*, No. 12-20322-CIV, 2013 WL 8695361, at *4 (S.D. Fla. Apr. 4, 2013) ("The problem for Defendant, though, is that it had the ability to compel, and thereby cure any potential

---

[25] Defendants also seek to strike Coker as an expert because other courts in other unrelated cases have stricken his opinions, affidavit, or report. *See* ECF No. [300] at 5-6 ("Cases Available to Defendants on Westlaw Demonstrate Generally Mr. Coker is not Qualified"). In support of this argument, Defendants direct the Court to a handful of cases where Coker's report or affidavit were stricken as untimely or cases where his opinion was deemed unpersuasive. *Id.* The Court will not judge Coker's qualifications or the reliability or helpfulness of his opinions in this case based on the particularities of other unrelated cases involving unrelated issues.

surprise, prior to the discovery cutoff, by advising Plaintiff that his disclosures did not comply with the rules and by requesting more specific disclosures. . . . Defendant could have sought intervention of the Court. Defendant did not do so, possibly believing that Plaintiff's non-compliance would doom his ability to offer any expert testimony. That is in and of itself a risky strategy."). The Motion to strike on this basis is rejected.

### C. GHM's Motion for Summary Judgment

#### 1. Defendants' Objection to Coker's Report on Summary Judgment

Before reaching the merits of GHM's Motion, the Court must address GHM's objection to Plaintiff's use of Coker's expert witness report and rebuttal report on summary judgment. GHM argues that Plaintiff did not submit a declaration from Coker stating the reports were made under penalty of perjury pursuant to 28 U.S.C. § 1746 and neither report contains such a declaration. *See* ECF No. [348] at 3. "Only 'pleadings, depositions, answers to interrogatories, and admissions *on file,* together with *affidavits'* can be considered by the district court in reviewing a summary judgment motion." *Carr v. Tatangelo*, 338 F.3d 1259, 1273 (11th Cir. 2003), *as amended* (Sept. 29, 2003) (quoting former Fed. R. Civ. P. 56(e)). "Unsworn statements 'do[ ] not meet the requirements of Fed. Rule Civ. Proc. 56(e)' and cannot be considered by a district court in ruling on a summary judgment motion." *Id.* (quoting *Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 158 n. 17 (1970)). If an expert's report is submitted without attestation, it has no probative value and cannot be considered on summary judgment. *Id.; see also Beard v. Green,* No. 08-22284-CIV-SEITZ, 2010 WL 411084, at *10 (S.D. Fla. Jan. 29, 2010) (citing *Nissho-Iwai American Corp. v. Kline,* 845 F.2d 1300, 1306-07 (5th Cir.1988)) ("Just as is true for an unsworn affidavit, a document which does not meet the requirements of *Fed.R.Civ.P.* 56(e) or 28 U.S.C. § 1746, is to be disregarded by a court in conjunction with its review of the

record in consideration of a defendant's motion for summary judgment."). This Court has already stricken some of Coker's opinions, as explained above, or has otherwise deemed the opinions moot in light of the Court's rulings on ascertainability and standing. Even if Coker's opinions were intact, this Court cannot consider his report or rebuttal report at the summary judgment stage as neither of them are in the form of an affidavit or attested to under penalty of perjury.[26]

### 2. Willfulness

FACTA provides that "no person that accepts credit cards or debit cards for the transaction of business shall print more than the last 5 digits of the card number or the expiration date upon any receipt provided to the cardholder at the point of the sale or transaction." 15 U.S.C. § 1681c(g)(1). Thus, to prove direct liability, Plaintiff must demonstrate that Defendants are (1) a "person" that (2) accepts credit or debit cards for the transaction of business and (3) prints and provides the receipt, in this case a folio, to the cardholder at the point of sale. *Id.* The word "person" is defined as "any individual, partnership, corporation, trust, estate, cooperative, association, government or governmental subdivision or agency, or other entity." 15 U.S.C. § 1681a(b). In order to be entitled to damages, consisting of statutory damages, punitive damages, and attorneys' fees, Plaintiff must also prove that Defendants' violation of FACTA was done "willfully." *See* 28 U.S.C. § 1681n(a). The term "willfully" in § 1681n(a) has been construed as requiring evidence of a knowing or reckless disregard for the law. *Collins v. Experian Info. Sols., Inc.*, 775 F.3d 1330, 1336 (11th Cir.), *on reh'g sub nom. Collins v. Equable Ascent Fin.,*

---

[26] Similarly, GHM objects to Plaintiff's use of a document that purports to be from the Federal Trade Commission's 2012 Consumer Sentinel Network. *See* ECF No. 336-2. Plaintiff does not proffer or otherwise explain how this document may be considered on summary judgment. In any event, Plaintiff proffers facts from this report to support his position that identity theft in Florida is prevalent. Because these facts are only probative in deciding whether Plaintiff sustained any concrete harm and the Court has already answered that question in the affirmative, these facts are not material to the issues remaining on summary judgment.

*LLC*, 781 F.3d 1270 (11th Cir. 2015); *Harris v. Mexican Specialty Foods, Inc.*, 564 F.3d 1301, 1310 (11th Cir. 2009); *Carlisle v. Nat'l Commercial Servs., Inc.*, No. 1:14-CV-515-TWT-LTW, 2017 WL 1075088, at *14 (N.D. Ga. Feb. 22, 2017), *report and recommendation adopted*, No. 1:14-CV-515-TWT, 2017 WL 1049454 (N.D. Ga. Mar. 20, 2017).  Thus, at trial, Plaintiff must prove that Defendants knowingly violated FACTA or were reckless in their violation.  Plaintiff's Response argues that an issue of fact exists as to whether Defendants' violation was both knowing and reckless.

### a. Knowing Violation

In its Motion, GHM originally assumed that Plaintiff was not pursuing a willfulness theory of liability based on a knowing violation of FACTA.  *See* ECF No. [325] at 13.  Plaintiff's Response, however, argues otherwise.  More specifically, Plaintiff states that an issue of fact exists because GHM was expressly aware of FACTA's requirements as evidenced by its training of its hotel general managers and front desk staff on FACTA compliance and its shared officers and offices with OPL, which was previously sued for a FACTA violation.  *See* ECF No. [336] at 6.  Adding to this argument, Plaintiff states that "GHM knew the PM system was programmed to print credit and debit card transaction receipts that disclosed card expiration dates because *the very same day* the PM system upgrade occurred in December 2015 GHM's staff circulated an email about receipt printing problems that listed the receipt contents, which included the card expiration date."  *Id.* (emphasis in original).

In this case, GHM does not dispute that it knew about FACTA's requirements during the relevant timeframe.[27]  *See* ECF No. [348] at 7 (stating it "does not dispute that it had knowledge

---

[27] Given GHM's admission that it knew about FACTA's requirements, the Court need not address Plaintiff's argument that OPL's involvement in another FACTA lawsuit is evidence of GHM's knowledge.  *See* ECF No. [336] at 6.

of FACTA."). However, knowledge of FACTA's requirements, standing alone, is not enough to prove willfulness. Plaintiff must demonstrate a knowing *disregard for the law*. *Collins*, 775 F.3d at 1336; *Carlisle*, 2017 WL 1075088 at *14 (dismissing amended complaint because there were no facts to support the notion that the defendant knew its actions violated the FCRA). This requires that GHM have actual knowledge that it was violating FACTA – not mere knowledge of FACTA. The record is devoid of any evidence demonstrating that GHM knew about the unmasking of expiration dates during the relevant timeframe. Instead, Plaintiff's argument is that GHM had countless opportunities to discover the FACTA violation but failed at every turn. While such evidence is probative on the issue of recklessness, it is not evidence of GHM's actual knowledge. Plaintiff does not direct the Court to a single FACTA decision in which a knowing violation was proven with anything less than actual knowledge. In fact, the Court's review of the law discussing knowing violations leads it to conclude otherwise. *See Keller v. Macon Cty. Greyhound Park, Inc.*, No. 3:07-CV-1098-WKW, 2011 WL 1559555, at *4 (M.D. Ala. Apr. 25, 2011), *aff'd*, 464 F. App'x 824 (11th Cir. 2012)(granting summary judgment because "there [wa]s no argument or any supporting facts that MCGP acquired knowledge that it was printing FACTA violative receipts prior to December 5, 2007."); *Cowley v. Burger King Corp.*, No. 07-21772-CIV, 2008 WL 8910653, at *5 (S.D. Fla. May 23, 2008) ("Plaintiff does not conclusively establish that Defendant knowingly issued receipts that contained credit card's expiration date. And because Plaintiff does not do so, summary judgment [in his favor] is inappropriate."). Because the record contains no evidence of GHM's actual knowledge of the FACTA violation, Plaintiff cannot prove this theory of liability as a matter of law. Therefore, GHM's Motion for Summary Judgment is granted on this specific theory.

### b. Reckless Violation

The Court must next determine whether an issue of fact exists as to GHM's alleged reckless violation of FACTA. "[A] company subject to [the] FCRA does not act in reckless disregard of it unless the action is not only a violation under a reasonable reading of the statute's terms, but shows that the company ran a risk of violating the law substantially greater than the risk associated with a reading that was merely careless." *Safeco*, 551 U.S. at 69. In order to determine if an interpretation is a reasonable reading of the statute's terms, a district court must determine whether such an interpretation "has a foundation in the statutory text" or whether the interpreting party "had the benefit of guidance from the courts of appeals," or federal regulatory agencies "that might have warned it away from the view it took." *Carlisle*, 2017 WL 1075088, at *14 (quoting *Safeco*, 551 U.S. at 69-70; *Seamans v. Temple Univ.*, 744 F.3d 853, 867-68 (3d Cir. 2014)). Here, none of the Defendants have taken the position that the printing of folios with unmasked expiration dates was permitted under FACTA, making it unnecessary to determine whether their interpretation of the statute was objectively reasonable. Instead, the Court must focus its analysis on whether there is evidence that Defendants "engaged in any form of reckless disregard of FACTA during this period." *Keller*, 2011 WL 1559555 at *4. Recklessness under FACTA is something more than negligence but less than a knowing violation of the law's requirements. *See Rosenthal v. Longchamp Coral Gables LLC*, No. 08-21757-CIV, 2009 WL 1854846, at *2 (S.D. Fla. June 29, 2009) (citing *Murray v. New Cingular Wireless Servs., Inc.*, 523 F.3d 719, 726 (7th Cir.2008); *Kubas v. Standard Parking Corp.*, 2009 WL 211967, *2 (N.D. Ill. Jan.29, 2009)); *Bouton v. Ocean Properties, Ltd.*, 201 F. Supp. 3d 1341, 1350 (S.D. Fla. 2016) ("Courts applying *Safeco* have made clear that under FACTA, a plaintiff must allege more than mere negligence.").

GHM asks the Court to apply a standard of recklessness that would also require proof of "an unjustifiably high risk of harm that is either known or so obvious that it should be known." *See* ECF No. [325] at 19. In support of this argument, Plaintiff cites to a one-page unpublished Eleventh Circuit decision affirming the entry of summary judgment in favor of the defendant in which the appellate court quoted from dicta in *Safeco*. *See Keller*, 464 F. App'x at 824. The opinion in *Keller*, however, affirmed the trial court's order without any analysis or discussion of the Supreme Court's definition of recklessness. *Id.* Much like GHM here, other defendants within have relied upon this same dicta to argue that recklessness under FACTA requires proof of "risk of harm" to later learn that such a characterization of *Safeco*'s definition is "incorrect." *Cowley v. Burger King Corp.*, No. 07-21772-CIV, 2008 WL 8910653, at *6 (S.D. Fla. May 23, 2008). This is because "[t]he *Safeco* court used the term 'risk of harm' only in the context of explaining why 'recklessness' under FACTA refers to whether there was a 'reckless disregard of *statutory duty*." *Id.* (emphasis in original). *See also Ramirez v. Midwest Airlines, Inc.,* 537 F. Supp. 2d 1161, 1169 (D. Kan. 2008) ("Thus, it is the reckless disregard of statutory duties (not harm) that makes a violation willful. . . . Nowhere did the Court in *Safeco* suggest that the 'risk of harm' standard from tort law is incorporated into the FCRA."); *Soualian v. Int'l Coffee & Tea, LLC*, No. CV 07-0502RGKJCX, 2008 WL 410618, at *3 (C.D. Cal. Feb. 9, 2008) ("The Court also disagrees with Defendant's characterization of the reckless standard as requiring a risk of harm. . . . the correct inquiry here is whether Coffee Bean's actions were in reckless disregard of the FCRA."). Thus, this Court will limit its inquiry on summary judgment to whether GHM's actions constitute a reckless disregard of FACTA's requirements.

In support of summary judgment, GHM relies upon the district court's opinion in *Keller*, which was later affirmed by the Eleventh Circuit. The theory of recklessness in *Keller* was

materially different than the theory Plaintiff advances here, making the analysis in this case distinguishable from *Keller.* 2011 WL 1559555 at *3. Much like in this case, *Keller* involved a defendant that purchased a credit and debit card point of sale system from a specific vendor that also installed the software. *Id.* at *2. At some point later in time, the software crashed. *Id.* On the following day, the vendor restored the system, which, unbeknownst to the defendant, caused the system to print all sixteen credit card numbers on receipts. *Id.* The office manager of the food and beverage department would collect the merchant copies of credit card receipts on a daily basis, sort them, add the totals, and place tape around the stack. *Id.* at *3. Unlike this case, however, the office manager was never trained to look for FACTA violations when reviewing receipts. *Id.* Approximately six weeks later, the FACTA issue was discovered and corrected on the same date. *Id.*

The plaintiff in *Keller* argued in a conclusory fashion that the defendant "just chose to recklessly disregard the FACTA violations." *Id.* at *5. Although this argument was "unstated," the district court bridged the gap between the manager's review of the receipts and the plaintiff's conclusory argument by questioning whether the defendant's failure to train the manager in FACTA compliance was reckless. *Id.* Ultimately, the district court concluded that these failures may amount to carelessness, but the record was "wholly devoid of any coherent argument that it amounts to reckless disregard." *Id.* In this case, Plaintiff's theory is materially different than the one advanced in *Keller.* There is no dispute that both front desk staff and managers were trained to ensure there was FACTA compliance at the Jupiter Beach Resort. Unlike *Keller*, Plaintiff does not argue that GHM should have implemented measures to detect the violation. Plaintiff's theory is that GHM knew about FACTA, had repeated opportunities to detect the violations, and yet no one noticed the issue until months later when this lawsuit was filed.

In support of this theory, Plaintiff directs the Court to the 200 folios with unmasked expiration dates within the nightly audit packs. GHM dismisses this evidence as seemingly irrelevant because these folios were not handed to the customer at the point of sale and do not, therefore, represent FACTA violations. *See* ECF No. [348] at 9. GHM's argument misses the point. Plaintiff is not citing to these folios as evidence of other receipts provided to consumers at the point of sale. Plaintiff is citing to them as evidence of recklessness – evidence that in a three-and-one-half month time span front desk employees printed out folios containing unmasked credit card expiration dates on more than 200 occasions and then proceeded to place those folios into the nightly audit pack. These front desk employees were trained on matters of FACTA compliance. Therefore, they knew what they were looking for and yet they failed to spot the unmasking of expiration dates on 200 separate occasions.[28] Then, the manager on duty, also trained on FACTA compliance, was tasked with reviewing those folios within the audit pack, but did not notice the unmasked expiration dates either. Thus, arguably two sets of trained eyes looked at those 200 folios showing unmasked expirations dates during the relevant timeframe and never noticed a problem.

For summary judgment purposes, the Court must draw every inference in the non-moving party's favor. Plaintiff has presented sufficient evidence to create an issue of fact as to whether GHM was reckless in its failure to notice the FACTA violation and rectify it prior to Plaintiff's stay. Arguably, GHM, whose employees knew what to look for, had at least 400 opportunities to

---

[28] GHM also argues that there is no evidence these audit pack folios printed in the same format as customer-facing folios. *See* ECF No. [348] at 13. On summary judgment, however, the moving party – GHM - shoulders the initial burden to demonstrate the absence of a genuine issue of material fact. *See Shiver v. Chertoff*, 549 F.3d 1342, 1343 (11th Cir. 2008). GHM did not present any evidence to demonstrate that the audit pack folios indeed printed in a different format than the customer-facing folios or that the audit pack folios unmasked the expiration dates before and after the Oracle software upgrade, which would eliminate any argument that the front desk staff and general managers failed to detect a FACTA violation. On summary judgment, the Court is mindful that it must view all of the facts in the light most favorable to Plaintiff and draw all reasonable inferences in the record in Plaintiff's favor.

discover that the folios printed at the front desk and placed into the audit packs were unmasking credit card expiration dates. Based on this alone, the Court cannot conclude that no reasonable jury could find that GHM's actions were reckless.

The existence of an issue of fact becomes even more apparent when the Court considers Laykin's estimate that, during the three-and-a-half month timeframe, approximately 1,083 folios could have been printed at the front desk with unmasked expiration dates. Thus, in addition to the 400 missed opportunities to detect the FACTA violation in the audit packs, GHM possibly had another 1,083 opportunities to detect the issue as its front desk staff handed the folios to the customers. In addition, Plaintiff presented evidence of an email chain dated December 22, 2015 in which Oracle was informed that "the [f]ront [d]esk users can now access the guest folios within Billing, however, apparently they are now receiving the following message when attempting to perform an express checkout/post charges." ECF No. [290-18]. The error message, which did not pop up prior to the upgrade, references the need to set up a "GST FOLIO printer task." *Id.* Beneath that pop-up window, the screen reveals an unmasked credit card expiration date. *Id.* Taking all inferences in Plaintiff's favor, this creates an issue of fact as to whether the front desk employees should have detected a problem with the unmasked expiration dates as early as December 22, 2015. Ultimately, the jury will be tasked to decide whether this evidence rises only to the level of "mere human mistake" or to the level of a systematic failure amounting to recklessness. For these reasons, GHM's Motion is denied as to recklessness.

### 3. Standing

In its Motion for Summary Judgment, GHM once again raises the issue of Plaintiff's standing, arguing that Plaintiff has not demonstrated a concrete harm. All Defendants join in this argument and incorporate it by reference into their respective Motions. In its Reply, GHM

acknowledges this Court's recent ruling on standing and requests reconsideration. "[T]he courts have delineated three major grounds justifying reconsideration: (1) an intervening change in controlling law; (2) the availability of new evidence; and (3) the need to correct clear error or prevent manifest injustice." *Williams v. Cruise Ships Catering & Serv. Int'l, N.V.*, 320 F. Supp. 2d 1347, 1357-58 (S.D. Fla. 2004) (citing *Sussman v. Salem, Saxon & Nielsen, P.A.*, 153 F.R.D. 689, 694 (M.D. Fla. 1994)); *see Burger King Corp. v. Ashland Equities, Inc.*, 181 F. Supp. 2d 1366, 1369 (S.D. Fla. 2002). GHM does not specify the grounds upon which it seeks reconsideration. Despite this, the Court has independently reviewed all three grounds and none warrant the relief requested. First, GHM does not cite to any recent precedent from the Eleventh Circuit or the Supreme Court that would constitute an intervening change in *controlling* law. Likewise, it does not argue that new evidence relevant to standing has become available. To the contrary, GHM relies upon the same arguments and evidence involving Plaintiff's safeguarding of the folio previously presented at the class certification stage. As to the last basis for reconsideration, GHM does not raise a need to correct clear error or prevent manifest injustice and the Court concludes that no such need exists.

"[R]econsideration of a previous order is an extraordinary remedy to be employed sparingly in the interests of finality and conservation of scarce judicial resources." *Wendy's Int'l, Inc. v. Nu-Cape Const., Inc.*, 169 F.R.D. 680, 685 (M.D. Fla. 1996); *see also Campero USA Corp. v. ADS Foodservice, LLC*, 916 F. Supp. 2d 1284, 1290 (S.D. Fla. 2012). "A motion for reconsideration should not be used as a vehicle to present authorities available at the time of the first decision or to reiterate arguments previously made." *Z.K. Marine Inc. v. M/V Archigetis*, 808 F. Supp. 1561, 1563 (S.D. Fla. 1992). The Court finds that GHM is simply reiterating old arguments that have already been considered and rejected. For these reasons and those discussed

in Section III(A)(1) above, the Court declines GHM's invitation to reconsider its ruling on Article III standing.

### D.  Oprock Defendants' Motion for Summary Judgment

The Oprock Defendants seek summary judgment in their favor, arguing there is no evidence of their direct or vicarious liability for the actions of GHM or OPL.  As to Plaintiff's theory of direct liability, they argue that Plaintiff cannot prove they accept credit or debit cards for the transaction of business and print and provide the receipts to cardholders at the point of sale. 15 U.S.C. § 1681c(g)(1). As to Plaintiff's theory of vicarious liability, they argue that Plaintiff cannot satisfy any of the three theories available under the FCRA.  Finally, like GHM, they argue there is no evidence of willfulness.

#### a.  Direct Liability

In support of their Motion, the Oprock Defendants argue that they are merely the owner and lessee of the Jupiter Beach Resort and, as such, they do not accept credit or debit cards and they do not print or provide receipts to cardholders.  Responding to this argument, Plaintiff argues in conclusory fashion that as the owner and lessee of the Jupiter Beach Resort, they are automatically liable and cannot delegate their responsibility under FACTA.  Neither Plaintiff nor the Oprock Defendants take the time to differentiate between the potential liability of Oprock Fee, as the property owner, and Oprock TRS, as the property lessee.  The facts materially vary from Oprock Fee to Oprock TRS, so the Court will consider each separately.

##### 1.  Oprock Fee

The Court agrees with Oprock Fee that there are no grounds to subject it to direct liability under FACTA simply by virtue of its ownership of the Jupiter Beach Resort.  Plaintiff does not direct the Court to a single decision interpreting FACTA that imposes liability upon the premises

owner solely because it owns the property where the violation occurred. Instead, Plaintiff cites to one copyright infringement case discussing the imposition of joint and several liability on a corporate officer for a corporation's infringement and another case discussing liability for contributory copyright infringement on a premises owner. *See Broad. Music, Inc. v. Meadowlake, Ltd.*, No. 5:12CV1024, 2013 WL 3927793, at *3 (N.D. Ohio July 29, 2013), <u>aff'd,</u> 754 F.3d 353 (6th Cir. 2014) (emphasis added) ("Although the Sixth Circuit has not addressed the issue, almost every other circuit court in the country has adopted a two-prong test to determine *whether a corporate officer is jointly and severally liable with the corporation for copyright infringement.*"); *UMG Recordings, Inc. v. Sinnott*, 300 F. Supp. 2d 993, 1001 (E.D. Cal. 2004) ("Sinnott had knowledge of the vendors' infringing activity, yet continued to provide the site and facilities to allow the vendors to continue to sell counterfeit CDs and cassettes."). Neither of these cases is instructive on the interpretation of FACTA – a statute that makes no mention of imposing liability on the basis of property ownership. Plaintiff similarly relies on other cases interpreting other federal statutes that are not remotely similar to FACTA. *See United States v. Bestfoods*, 524 U.S. 51, 55 (1998) (emphasis added) (interpreting § 107 of the Comprehensive Environmental Response, Compensation, and Liability Act of 1980, which allowed lawsuits against "any person who at the time of disposal of any hazardous substance <u>*owned or operated any facility*</u>."); *Scott v. Suncoast Beverage Sales, Ltd.*, 295 F.3d 1223, 1231 (11th Cir. 2002) (finding that an employer cannot satisfy its statutory obligation to send an employee a COBRA notice by hiring a third party to send that notice). Unlike CERCLA, FACTA does not create a cause of action against the owner or operator of the facility, and unlike COBRA, FACTA does not impose any affirmative requirements on the owner of a property, much less requirements that cannot be delegated. The only FACTA decision upon

which Plaintiff relies does not create liability for Oprock Fee either as the entity sued therein was the one that accepted credit and debit card payments and printed the violative receipts. *See Edwards v. Toys "R" Us*, 527 F. Supp. 2d 1197, 1203-04 (C.D. Cal. 2007).

This Court, therefore, limits its inquiry to determine whether Oprock Fee accepted credit or debit cards for the transaction of business, printed the folios, and provided them to the cardholders at the Jupiter Beach Resort. Based on the Court's review of the record, it finds there is no evidence to demonstrate that Oprock Fee played such a role. Although Plaintiff states that Oprock Fee owned the fictitious name, Jupiter Beach Resort, the record evidence cited by Plaintiff reveals that only Oprock TRS owned the fictitious name during the relevant timeframe. *See* ECF No. [335-5]. Plaintiff also cites to the declaration of Ade to prove that Oprock Fee owns the folios from the Jupiter Beach Resort, but it is unclear how Ade has personal knowledge of such information or how his declaration can otherwise bind Oprock Fee.[29] Unlike Oprock TRS, there is no evidence that Oprock Fee entered into any contracts with Oracle for the software upgrade at issue. And although Plaintiff cites to Ade's corporate representative deposition for the proposition that the Oprock Defendants approved the upgrade prior to its implementation, *see* ECF No. [335] at 6, the testimony of the OPL and GHM corporate representative cannot be used as an admission against Oprock Fee. Even if it could, the Court's review of the cited testimony reveals that the "Rockwood asset manager" approved the software upgrade at the hotel. *See* ECF No. [290-4] at 24, 112. Plaintiff does not direct the Court to any

---

[29] Plaintiff cites to an August 3, 2017 fictitious name registration form as proof that Ade is currently a manager of Oprock Fee. However, Ade's declaration pre-dates this document by many months and the declaration does not identify Ade's relationship to Oprock Fee, if any. *See* ECF No. [193]. The Court, therefore, cannot determine whether Ade was a manager of Oprock Fee when the declaration was made or whether this is a new development.

testimony that would define "Rockwood asset manager" and the Court will not scour through the voluminous record to search for such a definition.

Based on the record, Oprock Fee's only relationship to this lawsuit is its status as the premises owner of the Jupiter Beach Resort. Taking Plaintiff's liability argument to its natural conclusion would mean that any individual or entity that owns a building where businesses accept credit or debit cards and print receipts would be liable for a FACTA violation simply due to property ownership rights. This would mean that the owner of a shopping center leasing out retail space to different tenants would be subject to direct liability for any FACTA violations committed by those tenants simply because the owner derives a financial benefit from its lease. Plaintiff's theory of liability expands FACTA far beyond the statute's intended scope. For these reasons, the Court finds there is no evidence to hold Oprock Fee directly liability under FACTA.

### 2. *Oprock TRS*

As to Oprock TRS, the Court likewise limits its analysis to whether it accepted debit or credit cards and printed and provided non-FACTA compliant receipts to cardholders. The evidence here is a closer question that creates an issue of fact for the jury's determination. Although Oprock TRS attempts to minimize its role as the lessee that delegated all hotel management experience to GHM, Oprock TRS was the entity that entered into the contract with Oracle for the software upgrade that led to the FACTA violations. GHM did not enter into that contract. Further, as Plaintiff points out, Oprock TRS owns the fictitious name Jupiter Beach Resort, which is on the folios at issue. Drawing all inferences in Plaintiff's favor, this evidence is sufficient to create an issue of fact for the jury to determine whether Oprock TRS accepted credit and debit cards and printed them. However, as explained below, Oprock TRS cannot be subject to direct liability as there is no evidence that it willfully violated FACTA.

### b. Vicarious Liability

With regard to Plaintiff's theory of vicarious liability, the Oprock Defendants argue that Plaintiff can prove none of the three theories recognized under the FCRA – authorization, *respondeat superior*, or apparent agency. Plaintiff, on the other hand, attempts to establish a vicarious liability claim against both Oprock Defendants under all three theories. Courts have found that corporations can be held vicariously liable for the actions committed by their employees or agents under the FCRA. *See Edwards*, 527 F. Supp. 2d at 1211; *Jones v. Fed. Fin. Res. Corp.*, 144 F.3d 961, 966 (6th Cir. 1998). Under the first theory, "a principal may be vicariously liable for an agent's tortious conduct if the principal expressly or implicitly authorized the conduct." *Id.* A *respondeat superior* theory imposes vicarious liability on a principal "for torts committed by an agent when the agent acts for the benefit of his principal in the scope of his employment." *Id.* And finally, a theory of apparent agency imposes vicarious liability on the principal for an agent's tortious conduct "if the principal . . . held the agent out to third parties as possessing sufficient authority to commit the particular act in question and there was reliance on the apparent authority." *Id.* (omission in original). With this framework in mind, the Court will address each theory of vicarious liability against each Oprock Defendant.

### 1. Oprock Fee

With regard to Oprock Fee, the Court finds there is no viable theory of vicarious liability that can survive summary judgment. Plaintiff's Response makes no attempt to distinguish between Oprock Fee and Oprock TRS' respective alleged statuses as principals. However, each Defendant is a separate legal entity and must be given separate consideration. It is undisputed that Oprock Fee does not have any contractual relationships with OPL or GHM. To the extent Oprock Fee has a contractual relationship with any Defendant in this action, it would be with

Oprock TRS, as a lessor-lessee, but Plaintiff does not advance such a theory of liability. Further, Plaintiff did not even file the lease agreement to establish the scope of that relationship. In either event, the Court will not attempt to analyze a theory of liability that Plaintiff himself does not attempt to prove.

Thus, Plaintiff's sole theory is that Oprock Fee is vicariously liable for the actions of OPL and GHM, but the record does not establish a principal-agent relationship between either Oprock Fee and OPL or Oprock Fee and GHM under theories of authorization, *respondeat superior* or apparent agency. Further, as to apparent agency, it is undisputed that prior to the filing of this lawsuit, Plaintiff had never heard of Oprock Fee, did not visit the hotel in reliance upon who owned it, and did not believe that the individuals who worked at the front desk were agents of Oprock Fee. *See* ECF No. [166-1] at 66-68, 75. As of the date of his deposition, Plaintiff still did not know who Oprock Fee was. *Id.* at 63-65, and 69. *See Smith v. Am. Auto. Ins. Co.*, 498 So. 2d 448, 449 (Fla. 3d DCA 1986) (finding that the reliance element of an apparent agency claim could not be established when the plaintiff had never even heard of the insurance company at issue). Although the Oprock Defendants raise this exact point in their Motion, *see* ECF No. [324] at 13-14, Plaintiff makes no attempt to address this element of an apparent agency claim, much less dispute his own dispositive admissions at deposition. Because there are no viable theories of vicarious liability against Oprock Fee available to Plaintiff, summary judgment must be entered in Oprock Fee's favor.

### 2. Oprock TRS

Evidence of vicarious liability between Oprock TRS and GHM, however, presents a closer question. "Under Florida law, '[t]he existence of an agency relationship is ordinarily a question to be determined by a jury in accordance with the evidence adduced at trial.'" *Ernani v.*

*City of Miami Beach*, No. 12-CV-24550, 2014 WL 12514911, at *3 (S.D. Fla. Dec. 4, 2014) (quoting *Orlando Exec. Park Inc. v. Robbins*, 433 So. 2d 491, 494 (Fla. 1983)). Summary judgment may resolve the question of whether an agency relationship existed "only in instances where 'the evidence is capable of just one interpretation.'" *Id.* (quoting *Kobel v. Schlosser*, 614 So.2d 6, 7 (Fla. 4th DCA 1993)). This is not a case where the evidence is only subject to one interpretation as it relates to the relationship between Oprock TRS and GHM.

As the lessee of the Jupiter Beach Resort, Oprock TRS entered into a management agreement with GHM. Plaintiff argues that a principal-agent relationship exists between the two entities. Oprock TRS, however, points to the provisions within the management agreement that disclaim any such relationship and instead identify GHM as an independent contractor. *See* ECF No. [324] at 11 ("The relationship of Lessee and Management Company shall at all times be that of Lessee and independent contractor, and nothing contained in this Management Agreement shall be construed to create any form of agency . . ." ). Language within the contract disclaiming an agency relationship, however, does not conclusively establish the nature of the relationship. *See Edwards*, 527 F. Supp. 2d at 1213 (collecting cases establishing that an independent contractor status is not dispositive and such a determination will depend upon the circumstances of the whole activity and not such a singular, isolated factor). To establish actual agency, Plaintiff must demonstrate: "(1) acknowledgement by the principal that the agent will act for him, (2) the agent's acceptance of the undertaking, and (3) control by the principal over the actions of the agent." *Ernani*, 2014 WL 12514911 at *3.

Agency here turns on a question of control. Although the management agreement may grant GHM exclusive operational control over the Jupiter Beach Resort, the contract for the Oracle upgrade at issue that led to the FACTA violation was entered into by Oprock TRS – not

GHM.  This evidence creates a question as to whether Oprock TRS still maintained some control over GHM's actions, especially its choice of software used to print folios at the hotel, as Oprock TRS signed and, according to the contract, agreed to be invoiced and pay for the software upgrade and all other services provided by Oracle.  *See* ECF No. [290-19].  In addition, Oprock TRS arguably retained some minimal control over GHM in that all folios reflected the name of Oprock TRS' fictitious entity – Jupiter Beach Resort – and not any fictitious entity owned by GHM.  Oprock TRS also maintained the right to terminate the management agreement with GHM in the event of a direct or indirect transfer or assignment by GHM that "would result in fewer than four (4) of the following seven individuals: William Walsh, Patrick Walsh, Michael Walsh, Mark Walsh, Rich Ade, Tom Varley, Andy Berger continuing to have full time senior management positions with" GHM.  ECF No. [92-3] at § 18.01(A).  One of these individuals is Michael Walsh, Oprock TRS' Vice President.  This clause presents a question as to whether Oprock TRS maintained control over GHM's actions by reserving the right to cancel the contract in the event that certain individuals of its choosing were no longer within GHM's senior management.  Thus, while the management agreement may have delegated all rights to operate the hotel to GHM, the evidence creates a question of fact as to whether Oprock TRS exercised control over GHM's actions notwithstanding the language in the agreement.  On these facts, the Court cannot grant summary judgment in favor of Oprock TRS under a theory of actual agency.

Plaintiff's theory of apparent agency against Oprock TRS, however, is without any merit.  The record is devoid of any evidence that Oprock TRS held GHM out to Plaintiff as its agent and that Plaintiff, in turn, relied upon such a representation to his detriment.  To the contrary, Plaintiff candidly admitted that he had never heard of Oprock TRS prior to his stay at

the Jupiter Beach Resort, that he did not rely upon Oprock TRS' status as the lessee of the hotel when staying there, and that, as of the date of his deposition, he still did not know Oprock TRS' role. *See* ECF No. [166-1] at 63-65, 66-69, 75. Even though Plaintiff must prove this element of an apparent agency claim, his Response completely glosses over this issue, failing to address any of this evidence or explain how he has otherwise demonstrated any reliance. His failure to satisfy this element of the apparent agency claim is fatal.

As to OPL, the Court finds that there is no principal-agent relationship between Oprock TRS and OPL. Plaintiff does not come forward with any evidence whatsoever establishing that Oprock TRS authorized OPL to act on its behalf, that OPL was its agent acting within the scope of its employment, or that it represented to Plaintiff that OPL could perform certain acts on its behalf and that Plaintiff relied upon such a representation to his detriment. Thus, Oprock TRS cannot be held vicariously liable for any acts of OPL.

### c. Willfulness

The Oprock Defendants also argue that Plaintiff cannot demonstrate they acted willfully under FACTA, a prerequisite to the recovery of any statutory damages. Starting with Oprock Fee, the Court has already determined that no basis exists to hold it directly liable under FACTA, much less to find that it either knowingly or recklessly violated FACTA. As to Oprock TRS, however, because an issue of fact exists as to its direct liability under FACTA, the Court must consider whether there is any evidence of willfulness.

As explained in section III(c)(2) above, willfulness may be proven with evidence of either a knowing or a reckless violation of FACTA. Starting with the question of whether Oprock TRS knowingly violated FACTA, the parties dispute whether Oprock TRS knew about FACTA's requirements in the first place. Plaintiff attempts to impute the FACTA knowledge of

Oprock TRS officers, such as Vice President Michael Walsh, to the entity. Even if the Court assumed that Oprock TRS knew about FACTA's requirements through Michael Walsh, the claim still fails because knowledge of FACTA's requirements is insufficient to prove willfulness. Plaintiff must demonstrate that Oprock TRS knew about FACTA's requirements *and* that Oprock TRS knowingly violated its requirements. *See Keller*, 2011 WL 1559555 at *4 (granting summary judgment because "there [wa]s no argument or any supporting facts that MCGP acquired knowledge that it was printing FACTA violative receipts prior to December 5, 2007."); *Cowley*, 2008 WL 8910653 at *5 ("Plaintiff does not conclusively establish that Defendant knowingly issued receipts that contained credit card's expiration date. And because Plaintiff does not do so, summary judgment [in his favor] is inappropriate.").

There is no evidence in the record to demonstrate that anyone at Oprock TRS ever saw the non-compliant FACTA folios during the relevant timeframe, much less that they knew about the unmasking of expiration dates and continued to violate FACTA anyway. In support of his position, Plaintiff states in a conclusory fashion that Oprock TRS took no action or reasonable precautions to prevent the FACTA violations, but he does not cite to any evidence. It appears that Plaintiff's only evidence of knowledge is a provision within the lease agreement between Oprock Fee and Oprock TRS in which Oprock TRS agreed to generally comply with federal law. *See* ECF No. [335] at 18. Even if such a lease agreement were part of the summary judgment record, which it is not as explained above, this general agreement to comply with federal law does not establish that Oprock TRS knew about the ongoing FACTA violation and failed to take action. Without any evidence of actual knowledge, Plaintiff's claim against Oprock TRS for a knowing violation of FACTA necessarily fails.

Similarly, the Court concludes that Plaintiff failed to establish that Oprock TRS recklessly violated FACTA. Again, assuming without deciding that Oprock TRS knew about FACTA's requirements, Plaintiff does not present any evidence suggesting that Oprock TRS – as opposed to GHM – systematically failed to discover the FACTA violative receipts during the three-and-one-half month time span. There is no evidence that any Oprock TRS employees worked at the front desk of the Jupiter Beach Resort or in management, much less that any such Oprock TRS employees were trained in FACTA and had an opportunity to scrutinize the folios for any violations. Here, the evidence as to Oprock TRS does not even rise to the level of negligence as there is no proof that Oprock TRS should have known of a FACTA issue. Absent evidence of a knowing or reckless violation of FACTA, Plaintiff's direct liability claim against Oprock TRS cannot survive summary judgment.

### E. OPL's Motion for Summary Judgment

OPL's Motion seeks summary judgment on numerous theories of liability, including piercing the corporate veil, the "central operations role" and "central receipt generating functions," "unitary business enterprise," direct liability, joint ownership and management, and agency. *See* ECF No. [326]. Plaintiff's Response, however, does not address many of these theories of liability. *See* ECF No. [337]. Instead, Plaintiff is only pursuing three theories of liability against OPL at the summary judgment stage - direct liability, common enterprise, and vicarious liability. For that reason, the Court limits its analysis to determine whether Plaintiff can maintain a claim against OPL under any of these three theories of liability. In addition, OPL introduces a new variation on its Article III standing argument – whether the purported injury is

fairly traceable to OPL.[30]   Specifically, OPL argues that "there must be a causal connection between the injury and the conduct complained of" and that Plaintiff cannot prove standing as to OPL because it "took no action that could have resulted in [Plaintiff's] harm."   *See* ECF No. [326] at 24.   This argument is intertwined with OPL's liability arguments; therefore, the Court will address this issue concurrently with matters of liability.

Also, in the introductory paragraph of its Motion, OPL "join[ed] all issues raised in *GHM Jupiter LLC's Motion for Summary Judgment,* [ECF No. 325], filed on September 22, 2017. . .*"* and, in its Reply, OPL "adopt[ed] GHM's Reply as to how it could never have been willful or reckless in the issuance of the folio to Plaintiff."   *See* ECF No. [326] at 1 (emphasis in original); ECF No. [349] at 11.   OPL's adoption of and joinder in GHM's Motion raises two additional issues for the Court's consideration – whether Plaintiff demonstrated OPL's willfulness and whether Plaintiff demonstrated a concrete harm for purposes of Article III standing.   The Court already addressed the latter argument in Section III(c)(3) above, but it has not addressed the matter of OPL's willfulness.   For that reason, the Court also addresses whether Plaintiff can demonstrate that OPL willfully violated FACTA.

### a.  Direct Liability

Plaintiff first advances a theory of direct liability under FACTA on the basis of OPL's admission that it was involved in the operation of the Jupiter Beach Resort and its protection of customer credit card information at its hotels.   *See* ECF No. [337] at 11.   This is not a veil piercing theory.   Instead, Plaintiff's theory is that an issue of fact exists as to whether, during the relevant timeframe, OPL was a "person that accept[ed] credit cards or debit cards for the transaction of business" and "print[ed] more than the last 5 digits of the card number or the

---

[30] OPL previously raised this issue in its Response to Plaintiff's Motion for Class Certification, but in its Order, this Court noted that OPL could not seek the affirmative relief requested in a response to a motion.

expiration date upon any receipt provided to the cardholder at the point of the sale or transaction." 15 U.S.C. § 1681c(g)(1).

In support of this claim, Plaintiff relies upon several website statements it attributes to OPL.[31]  Specifically, it relies upon multiple statements located on the website www.oplhotels.com as admissions made by OPL.  OPL, in turn, objects to the Court's consideration of any statements within this website, characterizing it as a "shared marketing website" and citing to case law in which courts did not consider statements on a website of a parent corporation to establish control over the subsidiary.  *See Dow v. Abercrombie & Kent Int'l, Inc.,* 2000 WL 688949 (N.D. Ill. May 24, 2000) ("However, the fact that A & K Kenya lists a website owned and operated by A & K International as its own is not probative of A & K International's control over A & K Kenya. Sharing a website is akin to sharing a logo, which is insufficient to evince control."); *J.L.B. Equities, Inc. v. Ocwen Fin. Corp.*, 131 F. Supp. 2d 544 (S.D.N.Y. 2001) ("However, the Court is not persuaded that a failure to distinguish between parent and subsidiary on a web page is sufficient to show that the parent controls the subsidiary's marketing and operational policies."); *Reers v. Deutsche Bahn AG*, 320 F. Supp. 2d 140, 157 (S.D.N.Y. 2004)("With respect to marketing policies, the fact that subsidiaries share a logo, or that the parent decides to present several corporations on a website in a unified fashion, is insufficient to show lack of formal separation between two entities.").  While challenging the admissibility of the website, OPL does not dispute its authenticity.

---

[31] OPL also objects to Plaintiff's reliance upon unsworn news articles in his Response.  *See* ECF No. [349] at 5.  The Court agrees with OPL.  Unsworn newspaper articles constitute inadmissible hearsay and cannot be considered as part of the summary judgment record.  *See Dallas Cty. v. Commercial Union Assur. Co.*, 286 F.2d 388, 391–92 (5th Cir. 1961) ("Of course, a newspaper article is hearsay, and in almost all circumstances is inadmissible.");  *Macuba v. Deboer*, 193 F.3d 1316, 1322 (11th Cir. 1999) ("The general rule is that inadmissible hearsay 'cannot be considered on a motion for summary judgment.").

The shortcoming of OPL's argument is that the website's terms and conditions page clearly states: "This website contains information on Ocean Properties, Limited products and services *only*." *See* ECF No. [290-6] at 109, 112 (emphasis added). To support its objection, OPL relies upon Ade's post-deposition declaration in which he states: "Many of the hotels owned by the Walsh Hotel entities are the ones marketed by PCFSI through the 'OPL and Affiliates' and 'OPAL' shared marketing websites referred to in Plaintiff's Second Amended Complaint." *See* ECF No. [326] at ¶ 8. However, Ade also testified as OPL's corporate representative and stated that OPL owns the website, www.oplhotels.com, acknowledged that the website states it *only* contains OPL's products and services, that OPL has the right to control its content if it chooses to do so, and OPL has instead delegated that task to non-party, PCFSI. *Id.* at 109, 112-113.

Courts routinely find that statements on the website of a party to a lawsuit are considered an admission by a party opponent. *See DePaola v. Nissan Hosp. Am., Inc.*, No. CIV.A. 1:04CV267-W, 2005 WL 2122265, at *7 (M.D. Ala. Aug. 29, 2005) ("Because these websites are authenticated by Hewitt's declaration, the statements on the site are admissions by a party opponent which may be considered by the court."); *Telewizja Polska USA, Inc. v. Echostar Satellite Corp.*, No. 02 C 3293, 2004 WL 2367740, at *5 (N.D. Ill. Oct. 15, 2004) ("[T]he contents of Polska's website may be considered an admission of a party-opponent, and are not barred by the hearsay rule"); *Van Westrienen v. Americontinental Collection Corp.*, 94 F. Supp. 2d 1087, 1109 (D. Or. 2000) ("[T]he contents of the website are not hearsay for purposes of this summary judgment motion. . . . the representations made by defendants on the website are admissible as admissions of the party-opponent under FRE 801(d)(2)(A)."); *Aug. v. Boyd Gaming Corp.*, 135 F. App'x 731, 733 (5th Cir. 2005) (considering casino's website statement

that "[t]he Chest is owned and operated by parent company, Boyd Gaming Corporation."). Regardless of whether OPL itself prepared the content of the website or PCFSI prepared it on OPL's behalf, the Court deems the statements on www.oplhotels.com to be admissions by a party opponent and admissible for purposes of summary judgment. *See* Fed. R. Evid. 801(d)(2) ("A statement that meets the following conditions is not hearsay: [t]he statement is offered against an opposing party and (A) was made by the party in an individual or representative capacity . . . (C) was made by a person whom the party authorized to make a statement on the subject; (D) was made by the party's agent or employee on a matter within the scope of that relationship and while it existed . . .").

Analyzing the contents of OPL's website, there is evidence that during the relevant timeframe, OPL publicly represented that the Jupiter Beach Resort was one of its properties. *See* ECF No. [47-13]. It states: "*Ocean Properties' resort and hotels* on Florida's popular East Coast attract both business travelers and leisure seekers from the United States, Europe and Latin America. Sophisticated and multicultural, *they range from the elegant Jupiter Beach Resort and Spa*, . . ." *Id.* (emphasis added). There is no suggestion on the website that Jupiter Beach Resort is owned by an affiliated entity. To the contrary, the website is written in the possessive – "Ocean Properties' resorts and hotels." This creates the inference that Jupiter Beach Resort is a resort operated by OPL. This is consistent with other marketing materials upon which Plaintiff relies. *See* ECF No. [47-19] (bearing the OPL and OPAL collection logos, stating "Ocean Properties has your travel story covered," identifying Jupiter Beach Resort as part of the hotel collection, and listing Kerry Morrisey from "Ocean Properties, Ltd." at "Kerry.Morrisey@oplhotels.com" as the media contact).

In addition, OPL's website contains a page entitled "Terms of Use & Privacy Policy."

This page states in relevant part:

> Ocean Properties, Ltd. respects the privacy of all our guests, and we are committed to protecting it. To best serve you throughout this website, you will be asked to provide a variety of information, such as name, mailing address, telephone number, email address, *credit card information*, etc. . . . Any personal information that is requested on our website is necessary in order to perform a particular service, such as processing your reservation.
>
> *We request personal information from you in order to process online reservations.* You must provide contact information (such as name, mailing address, telephone number and email address) *as well as financial information (such as credit card number and expiration date, etc.) in order for us to process your reservation. This information is used for billing purposes and to reserve a room.* . . .
>
> *Ocean Properties, Ltd. is committed to the security of the data collected on this Web site,* and treats all information you provide us as confidential. We use secure socket layer (SSL) encryption technology to *secure the privacy of credit card information*, name, address, email and other information you provide us.

*See* ECF No. [47-12] (emphasis added).

To further support its direct liability theory, Plaintiff argues that multiple individuals who were involved in implementing the subject Oracle upgrade and later resolving the problem were acting on behalf of OPL. OPL, on the other hand, argues it had no involvement in the resolution of the software defect, stating that PCFSI resolved the issue. An issue of fact exists as to whether these individuals were acting on behalf of OPL or non-party PCFSI when implementing and repairing the upgrade. Although OPL disclaims any relationship with these individuals, Plaintiff submitted evidence in the form of emails wherein Lazenby and Rich identified themselves as the IT Directors for OPL. *See* ECF No. [290-16]. Lazenby's role as an OPL IT Director is also documented in his Linked In profile, his submission to the Harvard alumni directory, and an interview he gave to the Portsmouth Herald. *See* ECF No. [290-8] at 41-42, 46-48, 60. Similarly, Rich identified himself as OPL's IT director in emails and his business

cards. *See* ECF No. [290-9] at 16-17, 20, 110-111. Additional email evidence reveals that other employees involved in the software upgrade, such as Gregory Dunham and Greg O'Keefe, also represented that they worked for OPL. *See* ECF No. [290-18] (December 22, 2015 emails identifying Greg O'Keefe as the Regional IT Manager for OPL, with an OPL mailing address and email address); ECF No. [290-16] (April 6, 2016 emails identifying Gregory Dunham as the regional controller with an OPL signature line and email address).

This evidence is sufficient to create an issue of fact as to whether OPL is directly liable for a violation of FACTA. That is, whether OPL qualifies as a person that accepts credit or debit cards for the transaction of business and was involved in the printing of receipts provided to cardholders. Liability would not be determined on a veil piercing theory, but premised upon OPL's direct violation of FACTA.

### b. Common Enterprise

Plaintiff's next theory of liability against OPL is based on common enterprise. Through this theory, Plaintiff attempts to hold OPL jointly and severally liable with the other Defendants because they operated as a common or unitary enterprise. *See* ECF No. [337] at 13. Such a theory requires evidence of "common control, the sharing of office space and officers;" business transacted through "a maze of interrelated companies; the commingling of corporate funds and failure to maintain separation of companies; unified advertising; and evidence that reveals that no real distinction exists between the corporate defendants." *See FTC v. Nat'l Urological Group, Inc.*, 645 F. Supp. 2d 1167, 1182 (N.D. Ga. 2008). It is, in essence, a form of corporate veil piercing. Plaintiff relies upon case law applying the common enterprise theory to claims of unfair and deceptive trade practices under the Federal Trade Commission Act, lawsuits under the Sherman Anti-Trust Act and the Lanham Act, and actions by the Securities and Exchange

Commission. *Id.* (emphasis added, internal citations omitted) ("'The general rule is that, absent highly unusual circumstances, the corporate entity will not be disregarded.' However, 'where the public interest is involved, *as it is in the enforcement of Section 5 of the Federal Trade Commission Ac*t, a strict adherence to common law principles is not required ... where strict adherence would enable the corporate device to be used to circumvent the policy of the statute.'"); *Delaware Watch Co. v. F.T.C.*, 332 F.2d 745, 746 (2d Cir. 1964) (applying common enterprise theory to individuals in federal trade commission action alleging unfair and deceptive trade practices); *Greensboro Lumber Co. v. Georgia Power Co.*, 643 F. Supp. 1345, 1367 (N.D. Ga. 1986), *aff'd,* 844 F.2d 1538 (11th Cir. 1988) (applying common enterprise theory to lawsuit alleging *violation of § 1 of the Sherman Act*); *Jackson v. Grupo Indus. Hotelero, S.A.*, No. 07-22046-CIV, 2009 WL 8634834 (S.D. Fla. Apr. 29, 2009); (applying joint and several liability to claims made under the Lanham Act); *S.E.C. v. BIH Corp.*, No. 2:10-CV-577-FTM-29, 2014 WL 3416854, at *5 (M.D. Fla. July 14, 2014) (emphasis added) ("Thus, *when parties act in concert to violate* <u>*securities*</u> *law*, each party is jointly and severally liable for disgorgement of ill-gotten gains even if a particular party did not receive the proceeds.").

However, Plaintiff does not direct the Court to any case law supporting the existence of a common or unitary enterprise theory under Florida corporate law, which would apply to this set of facts.[32] As OPL points out, Florida law has only applied this theory of liability in the context

---

[32] In lawsuits alleging a violation of the FCRA, other district courts have relied upon state corporate law to when deciding whether to pierce the corporate veil. *DeGraziano v. Verizon Commc'ns, Inc.*, 325 F. Supp. 2d 238, 245 (E.D.N.Y. 2004) (applying New York law to determine whether a parent company is liable for the acts of its wholly-owned subsidiary under the FCRA); *Hopkins v. Trans Union, L.L.C.*, No. 03-5433 ADM/RLE, 2004 WL 1854191, at *4 (D. Minn. Aug. 19, 2004) (applying Minnesota law in FCRA claim to determine whether the plaintiff may assert an alter ego claim to pierce the corporate veil); *Stich v. BAC Home Loans Servicing, LP*, No. 10-CV-01106-CMA-MEH, 2011 WL 1135456, at *3 (D. Colo. Mar. 29, 2011) (applying Colorado corporate law to analyze reverse veil piercing theory in FCRA claim).

of taxation schemes. *See Brunner Enterprises, Inc. v. Dep't of Revenue*, 452 So. 2d 550, 553 (Fla. 1984) ("[W]e hold that out-of-state investment income earned by a foreign corporation doing business in Florida is only taxable under the Florida Corporate Income Tax Code *if the Florida enterprise is part of a unitary business*."); *Roger Dean Enterprises, Inc. v. State, Dep't of Revenue*, 387 So. 2d 358, 363 (Fla. 1980) ("These regulations are directed primarily at determining whether a multistate taxpayer operates a 'unitary' business entirely subject to tax in Florida, or separate businesses in several states including Florida, as to which Florida may tax only the Florida business."). Absent some indication from Florida's appellate courts expanding the scope of the unitary or common business enterprise theory to areas other than taxation, this Court declines to expand Florida corporate law in this manner.

Under Florida corporate law, veil piercing may only occur "if the plaintiff can prove both that the corporation is a mere instrumentality or alter ego of the defendant, *and* that the defendant engaged in improper conduct in the formation or use of the corporation." *Oginsky v. Paragon Properties of Costa Rica LLC*, 784 F. Supp. 2d 1353, 1373 (S.D. Fla. 2011) (quoting *XL Vision, LLC v. Holloway,* 856 So.2d 1063, 1066 (Fla. 5th DCA 2003)) (emphasis added); *see also Garcia v. Kashi Co.*, 43 F. Supp. 3d 1359, 1394 (S.D. Fla. 2014) (quoting *SEB S.A. v. Sunbeam Corp.,* 148 F. App'x 774, 800 (11th Cir. 2005)) ("Or, as the Eleventh Circuit has stated: 'Florida law allows a party to pierce the corporate veil and hold a parent corporation liable for its subsidiary's actions if it can demonstrate first, 'that the subsidiary was a 'mere instrumentality' of the parent,' and second, 'that the parent engaged in 'improper conduct' through its organization or use of the subsidiary.'").

---

Plaintiff has not pled this veil piercing theory of liability in the Second Amended Complaint. *See* ECF No. [47]. But even if he did, it is undisputed that OPL is not the parent corporation of any of the Defendants. In fact, this Court has previously noted that the Walsh family interests, not OPL, own less than 7% of the parent entity that ultimately owns the Jupiter Beach Resort. *See* ECF No. [193] at ¶ 10. Not only is there no evidence of a parent-subsidiary relationship, but there is also no evidence that OPL engaged in some improper conduct relating to the creation of the other corporate Defendants. Thus, this theory of liability against OPL cannot survive summary judgment.

### c. Vicarious Liability

Finally, Plaintiff asserts vicarious liability claims against OPL. As explained above, Plaintiff may pursue his FACTA claim under theories of authorization, *respondeat superior*, or apparent agency. In his Response, Plaintiff identifies "Oprock/GHM" as the principals and itself as the agent. *See* ECF No. [337] at 15. In support of this position, Plaintiff argues that "OPL certainly exercised authority for Oprock/GHM, if not itself, to represent that it would protect sensitive customer card data, and allowed its self-described technology personnel to engage in implementing the software upgrades that caused the violations. . ." ECF No. [337] at 16. Such a theory turns the concepts of agency and vicarious liability upside down. In order to impose vicarious liability on OPL, OPL must be the principal and "Oprock/GHM" must be the agents. Plaintiff confuses the two concepts. Despite Plaintiff's initial characterization of the principal and agent, he then argues that OPL is vicariously liable for Oprock/GHM's actions if it authorized the conduct. To the extent that Plaintiff alternatively argues that it is the principal and GHM/Oprock Defendants are its agents, there is still no evidence of vicarious liability.

Under a theory of authorization, "a principal may be vicariously liable for an agent's tortious conduct if the principal expressly or implicitly authorized the conduct." *See Edwards*, 527 F. Supp. 2d at 1211. As evidence of such authorization, Plaintiff argues that OPL "expressly authorized the implementation of the software update through its shared officers with GHM and the Oprock Defendants . . . and by benefitting from these transactions." *See* ECF No. [337] at 16. However, there is no evidence that OPL authorized Oprock TRS to enter into the Oracle contract that led to the FACTA violation. The evidence is that Oprock TRS entered into the contract and that the "Rockwood asset manager" approved it. *See* ECF No. [290-4] at 24, 112.

Next, Plaintiff's *respondeat superior* theory likewise fails to impose vicarious liability on OPL as there is no evidence that GHM or the Oprock Defendants were acting for the benefit of OPL "in the scope of [their] employment." *Id.* There is no contractual or employment relationship between OPL and GHM, OPL and Oprock Fee, or OPL and Oprock TRS. Absent such a relationship, OPL cannot be liable for their actions under *respondeat superior*.

Finally, Plaintiff makes an apparent agency argument stemming from "OPL significantly advanc[ing] the FACTA violations using the GHM/Oprock Defendants' facilities and Jupiter Beach name, as set forth on the FACTA violating receipt that Plaintiff received." ECF No. [337] at 17. In order to prove this theory, the focus of the analysis must be on the communications made by the principal, in this case OPL, to the third party, Justin Bouton. *See Sun Life Assurance Co. of Canada (U.S.) v. Imperial Holdings, Inc.*, No. 13-80385, 2014 WL 12452450, at *3 (S.D. Fla. Jun. 26, 2014). Here, Plaintiff does not identify a single communication that OPL made to Plaintiff in which it represented that GHM, Oprock Fee or Oprock TRS were its agents. To the contrary, Plaintiff's theory of liability under FACTA is that, on its website, OPL held itself out as the operator of the hotel, not that it held out GHM and the Oprock Defendants

as its agents. Additionally, Plaintiff does not present any evidence that he relied upon agency statements from OPL. While he may have seen that the Jupiter Beach Resort is associated with OPL on its website before he booked his stay, this does not constitute reliance upon OPL's non-existent statement that the Oprock Defendants or GHM are its agents. Thus, Plaintiff's apparent agency claim also fails.

### d. Willfulness

By incorporating GHM's summary judgment arguments on willfulness into its Motion for Summary Judgment and Reply, OPL challenges Plaintiff's ability to demonstrate that it willfully violated FACTA. Notably, Plaintiff did not respond to or otherwise address any matters of OPL's willfulness in its Response. Nonetheless, the Court has independently reviewed the record to determine whether any issues of fact exist on this element of Plaintiff's FACTA claim.

Much like all other Defendants in this action, there is no evidence in the record that OPL knowingly violated FACTA. While OPL undisputedly knew of its requirements, Plaintiff has not presented any proof that OPL had actual knowledge of the ongoing FACTA violation or that OPL failed to correct the violation despite such knowledge.

This leaves the Court with the issue of recklessness. Neither party briefed this issue specifically as to OPL, relying instead upon the positions and evidence presented in conjunction with GHM's Motion. The Court, therefore, considers such evidence as applied to OPL, consisting of: (1) the 200 folios with unmasked expiration dates within the nightly audit packs, (2) the 1,083 folios that could have been printed at the front desk containing unmasked expiration dates, and (3) the December 22, 2015 email reporting an issue after the Oracle software upgrade. The first two arguments do not apply to OPL. This is because there is no evidence in the record that OPL's employees worked at the front desk or in management at the

Jupiter Beach Resort. Unlike GHM, OPL did not have opportunities to discover that the folios handed to cardholders were printing credit card expiration dates during a three-and-one-half month period. However, there is evidence that Lazenby, as OPL's IT Director, received the December 22, 2015 email in which a screen shot revealed an unmasked expiration date beneath a pop-up window. ECF No. [290-18]. Drawing all inferences in Plaintiff's favor, this email amounts to nothing more than negligence on Lazenby's part in that he failed to detect a potential FACTA violation. This isolated instance is insufficient to establish that OPL was reckless in its failure to detect the unmasking of credit card expiration dates. This is an instance of "mere human mistake" that does not allow the recovery of statutory damages under FACTA. Plaintiff's inability to prove OPL's willfulness is dispositive of his claim for statutory damages, requiring the entry of summary judgment in OPL's favor.

## IV.  CONCLUSION

For the reasons set forth above, it is **ORDERED AND ADJUDGED** as follows:

1.  Plaintiff's *Daubert* Motion to Exclude Defendant's Proposed Expert Testimony, **ECF No. [298]**, is **GRANTED in part** and **DENIED in part** as set forth in this Opinion;

2.  Defendants' Motion to Strike Plaintiff's Expert Witness Don Coker, **ECF No. [300]**, is **GRANTED in part** and **DENIED in part**  as set forth in this Opinion;

3.  Defendant GHM Jupiter, LLC's Motion for Summary Judgment, **ECF. No. [325]**, is **GRANTED in part** and **DENIED in part** as set forth in this opinion.

4.  Defendant Ocean Properties, Ltd.'s Motion for Summary Judgment, **ECF No. [326]**, is **GRANTED**.  The Court will enter final judgment by separate order.

5.  Defendants' Oprock Jupiter Fee, LLC and Oprock Jupiter TRS, LLC's Motion for

Summary Judgment, **ECF No. [324]**, is **GRANTED in part** and **DENIED in part**. As to Oprock Jupiter Fee, LLC, the Court will enter final judgment by separate order.

**DONE AND ORDERED** in Miami, Florida this 23rd day of October, 2017.

**BETH BLOOM**
**UNITED STATES DISTRICT COURT**

Copies to:

Counsel of Record